# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------     x

UNITED STATES OF AMERICA,                    :

            v.                                        :

                                               No. 18 CR 00087 (NSR)

ATIQ BUTT,                                   :
               Defendant.

-------------------------------------------------     x

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF HIS MOTIONS TO
## DISMISS THE INDICTMENT AND SUPPRESS EVIDENCE

Dated: December 14, 2018
       New York, New York

Camille M. Abate, Esq.
333 Park Avenue South
Suite 3A
New York, New York 10010
(212) 227-9003
Fax (212) 937-1212

# TABLE OF CONTENTS

Statement of Authorities…………………………………………………………… ii

Preliminary Statement…………………………………………………………… 1

Statement of Facts…………………………………………………………….. 1

Argument………………………………………………………………………… 6

    I.    THE AGENTS' ACTS IN DISABLING PRIVATE SURVEILLANCE
        CAMERAS OWNED BY ATIQ BUTT AND OPERATING INSIDE
        HIS HOME VIOLATE THE DUE PROCESS CLAUSE AND REQUIRE
        DISMISSAL OF THE INDICTMENT……………………………….. 6

    II.    THE DISABLING OF THE DEFENDANT'S SECURITY CAMERAS
        WAS AN UNLAWFUL SEIZURE OF HIS PROPERTY THAT
        EXCEEDED THE SCOPE OF THE SEARCH WARRANT AND
        WAS PER SE UNREASONABLE REQUIRING SUPPRESSION
        OF ALL THE SEIZED EVIDENCE………………………………….. 12

    III.    THE STATEMENTS MADE BY THE DEFENDANT TO
        LAW ENFORCEMENT DURING THE EXECUTION
        OF THE SEARCH WARRANT SHOULD BE SUPPRESSED…………. 14

        A.  At the Time of Questioning by Mazzuca, Atiq Butt Was In Custody… 15

        B.  The Right to Counsel Attached When William Sayegh Called and
            Attempted to Speak to Agents to Advise Them Not to Question His
            Clients…………………………………………………………… 17

Conclusion…………………………………………………………………………18

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Annan v. City of New York*, 2015 WL 5552271 (EDNY 2015)                13

*Arizona v. Youngblood*, 488 U.S. 51 (1988)                                         6, 7

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971)                             12

*Herring v. United States*, 555 U.S. 135 (2009)                                   14

*Michigan v. Jackson*, 475 U.S. 625 (1986)                                         17

*Riley v. California*, 573 U.S. __, 134 S.Ct. 2473 (2014)                     13

*Soldal v. Cook County, Ill.*, 506 U.S. 56 (1992)                                 12, 13

*Thompson v. Keohane*, 516 U.S. 99 (1995)                                         15

*Williams v. City of Paris*, 2016 WL 2354230 (E.D.Ky. May 4, 2016)    13

*United States v. Abdi*, 142 F.3d 566, 569 (2d Cir. 1998)                     17

*United States v. Ali*, 68 F.3d 1468 (2d Cir. 1995)                             16

*United States v. Ali*, 86 F.3d 275 (2d Cir. 1996)                               17

*United States v. Bethly*, 511 F.Supp.2d 426 (D. Del. 2007)              10

*United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994)                         11

*United States v. DiGregorio*, 795 F.Supp. 630 (SDNY 1992)             18

*United States v. Henriquez*, 731 F.2d 131 (2d Cir. 1984)                 6

*United States v. Jacobson*, 466 U.S. 109 (1984)                             12

*United States v. Jobson,* 102 F.3d 214 (6th Cir. 1996)                     6

*United States v. Jones*, 565 U.S. 400 (2012)                                   12

*United States v. Morrison*, 449 U.S. 361 (1981)                             18

*United States v. Wight*, 968 F.2d 1393, 1397 (1st Cir. 1992)           10

*United States v. Yevkapor*, 419 F.Supp.2d 242 (NDNY 2006)         6, 10

**Law Review Articles**

*Old Blood, Bad Blood, And Youngblood: Due Process, Lost Evidence, and the
Limits of Bad Faith*, 86 Wash. U. L. Rev. 241, 247 (2008)                7

**Policy Manuals**

FBI Domestic Investigations Operations Guide (2008)                      8, 11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ x

UNITED STATES OF AMERICA,       :


              v.              :

                                       No. 18 CR 00087 (NSR)

ATIQ BUTT,                 :
                  Defendant.

------------------------------------------------ x

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF HIS MOTIONS TO**
**DISMISS THE INDICTMENT AND SUPPRESS EVIDENCE**

<u>Preliminary Statement</u>

Defendant Atiq Butt respectfully submits this Memorandum of Law in support of his

motions, after completion of the hearing that was held on November 6 and November 27, 2018.[1]

<u>Statement of Facts</u>

Atiq Butt and his wife, Willomena Costa,[2] owned and resided at 142 Shindagen Hill

Road in Carmel, New York. At approximately 5:00 p.m. on December 13, 2017, a flood of

federal and state law enforcement agents entered the Butt home to execute a search warrant that

authorized a search and seizure of firearms, ammunition, and other evidence related to a

---

[1] Because there were two days of hearings, November 6 and 27, 2018, and the page numbering on the second day is not consecutive, references to the hearing transcript will be by witness name and page number.

[2] Mr. Butt and Ms. Costa have a legally registered Domestic Partnership in New York City. For ease of reference, however, Ms. Costa will be referred to as Mr. Butt's wife.

violation of 18 U.S.C. 922(g). As a result of the search, six long guns were recovered, along with a quantity of ammunition, a BB gun, and a bullet proof vest.

Due to issues with Ms. Costa's daughter, Olivia Murphy, the Butts had installed video surveillance cameras throughout the house. Two days before the execution of the search warrant, on December 11, 2017, Agent Amy Solek visited the house with Agent Kristen Schill to discuss an unrelated public corruption case. (Schill, 14, 34). During that first visit, Solek observed and discussed the surveillance system with the Butts. (Solek, 145) There were about 20 cameras inside the house, including the living room. (Butt, 92) The search warrant did not authorize the seizure of video surveillance cameras or recordings. (Mazzuca, 24)

On December 13, 2017, Atiq Butt was about to cook dinner when Agent Solek and the local sheriff arrived. (Butt, 90) Within a minute or two, multiple agents entered the house – "They just kept coming and coming." (Butt, 91) According to Mr. Butt, Agent Mazzuca patted him down and had the couch searched for weapons. Mazzuca then ordered him to "sit and don't move" from the couch in the living room. (Butt, 90, 92) Agent Solek told him he could not use his phone. (Butt, 106) However, both Solek – who was with Butt continuously from the beginning of the search – and Mazzuca denied a pat down of the defendant and search of the couch for weapons. (Solek, 144; Mazzuca, 28)

Willomena Costa was removed from the home until it was secured and then taken to the dining room or kitchenette some rooms away from Mr. Butt. (McKeon, 41, 56-58) Ms. Costa was directed not to use her phone by Agent McKeon, for some time until the house was "secure." (McKeon, 59) After being told not to use her phone, Ms. Costa never asked Agent McKeon again about using the phone. (*Id.*)

During the "clearing process" before the search, an agent or agents deliberately and intentionally disabled the surveillance cameras so that they would not record any of the activities of the agents. (Mazzuca, 5-7) Agent Solek was told by a member of the team that the video cameras and equipment had been turned off during the search but did not remember who it was that told her. (Solek, 147) Agent Mazzuca denied turning off the equipment. (Mazzuca, 7) However, Butt remembered Mazzuca pulling the wire out of the camera in the living room and asking where the system was to disable all the cameras. (Butt, 93) At about 6:39 p.m., Ms. Costa texted attorney William Sayegh that "FBI, ATF, and sheriff are in my house. No warrant presented. They have unplugged my house cameras and have not allowed me to plug it back in…." (Sayegh, 68)

There is no written protocol or directive from the FBI that permits agents executing a search warrant to disable or turn off a private individual's video surveillance equipment.[3] (Solek, 146) It is not FBI protocol but "basic law enforcement protocol." (Solek, 148) This is Mazzuca's individual practice to avoid wireless transmissions and keep agents and other individuals safe. (Mazzuca, 22, 27) Both Solek and Mazzuca claimed that they didn't know if disabling a private individual's security cameras was a policy of the FBI. (Solek, 148; Mazzuca, 23)

Within 10 minutes of their arrival, Mr. Butt heard agents shouting, "We hit the motherlode," and agents began high fiving each other in front of him. He did not believe he was free to leave; to the contrary, from their "motherlode" comments he knew he was going to be arrested after the first 10 minutes. (Butt, 95-96) No one told him he had the right to remain silent. No one told him he had the right to consult with an attorney. (Butt, 96-97)

---

[3] The policies and procedures in the FBI's Domestic Investigations and Operations Guide ("DIOG") will be discussed in detail in Point I, *infra*.

Solek and Mazzuca denied that Mr. Butt was prevented from getting up off the couch and moving around. (Solek, 23; Mazzuca, 10)[4] Yet Agent Schill saw him seated on the couch when she came up to the living room and he was there every time she walked by. (Schill, 26, 63-64) When Agent Prout entered after rear-covering the house, Mr. Butt was seated on the couch (Prout, 80). When Agent McKeon passed through the living room, she saw him seated. (McKeon, 41-42)

At the time of the search, the firm of William Sayegh represented the Butts on two civil matters. (Sayegh, 65) Mr. Sayegh was in Florida, riding his motorcycle, when a text came in at about 6:39 p.m. on December 13, 2017. *See* Exhibit D. When he received the text, Mr. Sayegh immediately called Ms. Costa back at the number she texted him from. (Sayegh, 70) At the moment he spoke to her, he believed his firm was engaged on behalf of both Ms. Costa and Mr. Butt. (Sayegh, 82-83) The firm in fact represented Mr. Butt the following day for arraignment on the federal complaint.

Mr. Sayegh asked her to put an agent on the phone so that he could advise them to conduct the search lawfully and not question his clients. He heard Ms. Costa saying that her attorney, William Sayegh, was on the phone and would like to speak with them. However, no agent would take the phone. (Sayegh, 73) Mr. Sayegh asked to speak to Atiq Butt, but they would not let her leave the area she was in. Mr. Sayegh asked her to yell over, and he heard her doing so, but Butt did not get on the phone. Ms. Costa told Sayegh that Butt couldn't hear her. (Sayegh, 74) Mr. Sayegh tried to call Butt on his cell phone, but Ms. Costa answered because she had both her own and Butt's cell phone. (Sayegh, 71-72)

---

[4] Solek testified on cross examination that he remained on the couch the entire time. (Solek, 126, 155)

By the time Agent Prout entered the house after clearing the perimeter, agents had already found and seized firearms. (Prout, 93) Firearms were found "very quickly" after the agents got to the premises. (Solek, 154) Agent Solek was the case agent who was to decide whether and when to arrest the defendant. (McKeon, 54-55) During the search, Solek knew Butt was going to be arrested. Once firearms were found, "we knew we would arrest him…." He was not free to leave after the firearms were found. (Solek, 153-154)

Agent Mazzuca was one of the agents tasked to search the basement. After long guns and ammunition were found, Mazzuca headed upstairs to question Butt. (Mazzuca, 29) He believed Butt was going to be arrested but did not inquire if he had been advised of his rights. (Mazzuca, 30) According to Agent Solek, there was "no particular reason" that Butt was not given the Miranda warnings after the firearms were found. (Solek, 155)

Agent Mazzuca asked Butt, "What are the big guns used for, do you use these for hunting?" According to Muzzuca, the defendant stated, "No, we shoot them for target practice." The agent responded with, "You shoot these guns here, near the house?" According to Mazzuca, Mr. Butt then said, "Oh, the property, we go back. It's plenty of good, you know, a lot of property in the back." Mazzuca then asked where the handguns were, and Mr. Butt denied having handguns. (Mazzuca, 13-14) Agent Schill overheard the statement about target practice and thought to herself, "Oh, that's good." (Schill, 31)

Agent McKeon remained in the basement for a couple of hours before returning upstairs to log the recovered items in. (McKeon, 44) According to McKeon, during a discussion with other agents about a bulletproof vest, Butt asked her why he couldn't have it. She responded by asking him, "Are you a convicted felon?" According to McKeon, he said yes. Agent McKeon

then claims that she stated that he couldn't have it, and Butt responded that it was not his vest. (McKeon, 44-45) This was well after guns had been found. (McKeon, 51)

On December 14, 2018, Agent Solek swore out a complaint, Docket # 17 Mag 9273, in which she erroneously declared in paragraph 5 that after receiving Miranda warnings, Butt stated that the guns belonged to his brother in law, but that he shoots them in the backyard while wearing the bulletproof vest. However, in point of fact he did not receive Miranda warnings prior to being questioned. The specific statement alleged in Paragraph 5 was never made. The complaint is "mistaken." (Solek, 137)

Argument

I.

THE AGENTS' ACTS IN DISABLING PRIVATE SURVEILLANCE CAMERAS OWNED BY ATIQ BUTT AND OPERATING INSIDE HIS HOME VIOLATE THE DUE PROCESS CLAUSE AND REQUIRE DISMISSAL OF THE INDICTMENT

The Due Process clause of the Fifth Amendment protects the liberty interest of an accused, insuring adjudicative fairness and deterring official misconduct. When the government destroys evidence in its possession without notifying the accused or allowing him access to the evidence, due process is violated if the destruction was in bad faith. *Arizona v. Youngblood*, 488 U.S. 51 (1988). *See also United States v. Jobson,* 102 F.3d 214 (6th Cir. 1996)(negligent destruction of dispatch tape did not violate due process); *United States v. Henriquez*, 731 F.2d 131 (2d Cir. 1984)(negligent destruction of certain tapes which a magistrate had ordered the government to preserve does not rise to level of dismissal; however, where destruction is deliberate, sanctions will normally follow); *United States v. Yevkapor*, 419 F.Supp.2d 242 (NDNY 2006)(government was precluded from using video segments recorded during border stop and search due to deliberate destruction of remainder of video).

*Youngblood's* bad faith standard is hard to define. "Incoherence characterizes post-Youngblood case law decided in state and lower federal courts. There are significant disparities in the ways in which courts have interpreted fundamental aspects of Youngblood, including the meaning of 'bad faith,' whether the lost evidence must be potentially exculpatory or possess apparent exculpatory value to establish a due process violation, and what remedy is available in the event of a violation…. Over the past two decades, only a handful of courts have found due process violations." Norman C. Bay, *Old Blood, Bad Blood, And Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith*, 86 Wash. U. L. Rev. 241, 247 (2008).[5]

However, the instant case has a significant wrinkle that separates it from *Youngblood* and its progeny: the security surveillance cameras at issue here were installed by the Butts in their own home. They were not in the agents' or government's possession, and did not belong to any law enforcement agency. They were the private property of Atiq Butt and Willomena Costa, installed for private reasons having nothing to do with the agents or the search. The members of the search team that disabled the cameras' recording capability did so deliberately without a higher up's authorization and without the consent of the Butts.

This was a rogue act. In disabling the video surveillance cameras the agents obstructed justice in that they destroyed Mr. Butt's right to a fair trial by preventing him from offering factual and unequivocal evidence on his own behalf, a conundrum which goes directly to the heart of due process. They essentially stole three hours' worth of video recording that would

---

[5] *Youngblood* was a child victim rape, a one witness identification case where the police allowed clothing evidence to erode due to lack of refrigeration. This was in the infancy of DNA testing, when forensic DNA typing did not exist and there was no available procedure to test the eroded clothing. Fifteen years later, in 2000, police tested a rectal swab from the victim with forensic DNA typing, and the results exonerated Youngblood, who was factually innocent. He was released from prison and his conviction was vacated. Norman C. Bay, *Old Blood, Bad Blood, And Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith*, 86 Wash. U. L. Rev. 241, 276 (2008).

have factually and objectively captured the conduct of the search as well as the agents' actions towards the defendant and his wife.

FBI domestic policy is wholly contained in the Domestic Investigations Operations Guide ("DIOG"), which in 2008, under then FBI head Robert Mueller, replaced numerous FBI manuals, electronic communications, letterhead memoranda, and other policy documents in order to "standardize policy so that criminal … investigative activities are performed in a legal and consistent manner." DIOG § 1 (Scope and Purpose). Section 18.7.1 spells out procedures for executing searches with a warrant or court order. There is no procedure for disabling private security systems; to the contrary, any deviation from the agency's written procedures must be approved **in advance** by the Deputy Director of the FBI. DIOG §§ 2 and 3.2.  Agent Solek – the case agent in the instant case – specifically inquired about the presence of security cameras in the home with Ms. Costa and Mr. Butt two days before, when she questioned the Butts on the unrelated public corruption matter. (Solek, 145) She had ample time to seek approval from the Deputy Director to disable the surveillance prior to the execution of the search warrant. The rogue agents here disregarded their agency's own written protocol.

Moreover, DIOG § 3.3 requires Special Agents to ensure civil liberties and privacy are protected throughout the assessment or investigative process. Section 4 of the DIOG states that agents have a responsibility "to protect the American public, not only from crime and terrorism, but also from incursions into their constitutional rights; accordingly, all investigative activities must fully adhere to the Constitution and the principles of civil liberty and privacy."

The government will no doubt argue that, as Agent Mazzuca testified, safety concerns dictated his actions (although he denied on cross examination that he was the one who disabled the cameras). His – and thus the government's – argument is, first, that he didn't want the video

recording "to be transmitted to other people who may be monitoring it, watching our protocol as to how we did our entry, our tactical entries…." (Mazzuca, 6) This is a specious argument, since anyone who is the subject of a search, such as Mr. Butt, has watched the agents "do" their entry; moreover, every single agent testified in open court about the clearing process and the search: who was doing what, where, and why. The government at the hearing did not ask for the courtroom to be closed and locked, nor the transcript sealed with regard to the manner of entry.

The second concern that Mazzuca identified – that a cooperator who provided information might be put in danger through wireless transmission to others who are monitoring the cameras – is wholly inapplicable to this case, as Mazzuca had to admit.[6] There were no cooperating witnesses who accompanied the agents to the house. (Mazzuca, 6-7) Further, Mazzuca had no idea if the security cameras were capable of digital transmission to others. He did not recall if he knew about the cameras before he got there; only that he saw them when he arrived. He didn't recall discussing it at the tactical meeting before the search. (Mazzuca, 22) This second safety concern is thus wholly pretextual as well.

In any event, the defendant's constitutional right to due process of law dramatically outweighs these types of alleged safety concerns. The rogue actions of the agents have heavily undermined Mr. Butt's ability to defend himself at this hearing and, most importantly, at trial. Butt now cannot introduce video recordings to dispute the agents' testimony as to where long guns were found. A significant part of Mr. Butt's defense is that these were not his rifles and he did not possess nor exert control over them. At the time of the search they were not loosely stored in an unlocked closet but locked in a gun cabinet built by his brother-in-law, Nathaniel

---

[6] This is not a gang or mob conspiracy case, with other potential conspirators still at liberty. Atiq Butt is a doctor by education, who was convicted of one non-violent felony over twenty years ago, charged here with simple possession of several rifles that would be perfectly legal to own but for his theft by deception conviction in New Jersey.

MacElhinney, for storage of his own guns.[7] Instead of video footage to prove this, the defendant is now left to verbally dispute it, and argue that the agents' disabling of the security cameras should be held against the government at trial – a much weaker position.

In *United States v. Yevakpor*, 419 F.Supp.2d 242 (NDNY 2006), a Customs supervisor intentionally chose to preserve only three one-minute clips of video surveillance out of an encounter that took at least 44 minutes. The district judge excluded the video clips from the government's case, stating:

> [I]t was not an inadvertent failure by Customs to preserve, but **an affirmative order by a Customs supervisor to only preserve the selected three minutes of tape knowing that the subject of the video was to face criminal proceedings**. … **This was not an inadvertent erasure, and such spoliation, especially in a criminal case where one's very liberty is at stake, is unacceptable.** … Given the current state of affairs in our nation, when surveillance occurs both with and without our knowledge, a great danger to liberty would exist if Government could pick and choose segments of recordings for use in prosecution, destroy the remainder, and then argue that the defense must show that the destroyed evidence contained exculpatory or otherwise potentially useful and relevant information. 419 F.Supp.2d at 246-247, 252. (Emphasis added.)

In *Yevakpor*, the defense did not ask for dismissal, but exclusion of the three short clips of video evidence at trial.

Here, Mr. Butt urges this Court to dismiss the indictment. The agents' deliberate action in this case constitutes a gross deviation from the FBI's own written domestic policy in the DIOG, and indeed displays a flagrant disregard for the standards embodied there. The fairness of the entire process for Atiq Butt has been severely undermined. He has been stripped of an objective

---

[7] The long guns were not seized from Butt's person. The government must prove at trial that the defendant had constructive possession. "The government cannot establish dominion and control by showing [the defendant's] mere proximity to the gun, or mere presence on the property where it is located….but rather, additional evidence must link the defendant to the [item]." *United States v. Bethly*, 511 F.Supp.2d 426, 430-31 (D. Del. 2007)(citations omitted); "[T]he government must prove that the defendant had dominion and control over the area where the contraband was found….however, mere presence or association with another who possessed the contraband is insufficient to establish constructive possession." *United States v. Wight*, 968 F.2d 1393, 1397 (1st Cir. 1992).

recorded account of what the agents did and where the agents found the rifles at issue through their deliberate interference with his security cameras. The prejudice to his case is overwhelming.

"Unlike cases in which the prosecutor fails to disclose Brady material, where a court may order a new trial at which the undisclosed evidence can be introduced, the disposition of evidence that is central to the case may permanently deprive the defendant of due process…. [T]he decision to either suppress … or to dismiss the indictment turns on the prejudice that resulted to the defendant at trial….Such factors as the centrality of the evidence at trial, the reliability of the secondary evidence, and the effect such destruction had on the defendant's ability to present a defense, must be considered in the calculus." *United States v. Bohl*, 25 F.3d 904, 914 (10th Cir. 1994).

The loss of camera footage of the search means that the testimony of the agents at trial is now unassailable by objective proof. There is no "secondary evidence" that can take the place of video recordings. Instead, if allowed to proceed, the trial will devolve into a swearing contest. Because the agents' actions devastated Mr. Butt's ability to present a defense, he has been denied due process of law.

This Court should dismiss the indictment. The interference with the security cameras was admittedly deliberate and a willful deviation from written FBI policy. At the hearing, both Solek and Mazzuca falsely testified that they were unaware of the written protocol or directives of the FBI. Neither agent mentioned, despite being asked, that there were written protocols on executing search warrants contained in the DOIG. (Solek, 146; Mazzuca, 26-27) Further and more importantly, it is not these agents' province to disregard the procedures that were so carefully laid down by both the head of the FBI and the Attorney General of the United States.

Moreover, Solek advised the Court that this has happened before. (Solek, 148) She then followed up that testimony by stating, "I shouldn't have said it," indicating knowledge that her conduct was contrary to FBI established policy and procedures. Mazzuca testified in response to the Court's question that this is a regular practice of his with the FBI. (Mazzuca, 26) The rogue conduct of these agents, in rank violation of the DIOG, will continue unabated unless the Court sanctions the government by dismissing the indictment.

## II.

### THE DISABLING OF THE DEFENDANT'S SECURITY CAMERAS WAS AN UNLAWFUL SEIZURE OF HIS PROPERTY THAT EXCEEDED THE SCOPE OF THE SEARCH WARRANT AND WAS PER SE UNREASONABLE REQUIRING SUPPRESSION OF ALL THE SEIZED EVIDENCE

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, or effects, against unreasonable searches and seizures of property by the government." For Fourth Amendment purposes, a seizure occurs when "there is some meaningful interference with a person's possessory interests in [the] property." *United States v. Jacobson*, 466 U.S. 109, 113 (1984). A seizure of property is subject to Fourth Amendment scrutiny regardless of whether the property is subsequently searched. *Soldal v. Cook County, Ill.*, 506 U.S. 56, 68 (1992). *See also United States v. Jones*, 565 U.S. 400 (2012). Any searches or seizures "conducted outside the judicial process … are per se unreasonable under the Fourth Amendment" unless it falls within one of the narrow exceptions to the warrant requirement. *Coolidge v. New Hampshire*, 403 U.S. 443, 453-55 (1971).

While there are no cases directly on point that involve the seizure of a defendant's own video surveillance equipment, the instant case can be analogized to cases under 42 U.S.C. § 1983, where police seize a person's cell phone and erase or delete the video recording.

In *Annan v. City of New York*, 2015 WL 5552271 (EDNY 2015), the plaintiff claimed that after he recorded a video of the police beating up his friend, the police demanded his cell phone and erased the video. In denying the defendant police officers' motion for summary judgment on the Fourth Amendment claim, the court held that the police must obtain a warrant to seize a cell phone or to view its contents. *Id*. at p. 8, *citing Riley v. California*, 573 U.S. __, 134 S.Ct. 2473, 2482 (2014).

In *Williams v. City of Paris*, 2016 WL 2354230 (E.D.Ky. May 4, 2016), police seized Williams' cell phone but did not delete video nor search the phone. The issue was "whether police were allowed to seize Williams' property without a warrant and without her consent…." The court held that any reasonable officer would have known that established Fourth Amendment law prohibited the warrantless seizure of Williams' cell phone absent an exception to the warrant requirement.[8]

Here, it is uncontested that the agents meaningfully interfered with the defendant's possessory interest in the security cameras and thus seized them. *Jacobson*, *supra*. The Fourth Amendment protects against seizures of property "even though no search within the meaning of the Amendment has taken place…. [S]eizures of effects that are not authorized by a warrant are reasonable only [if] there is probable cause to associate the property with criminal activity." *Soldal v. Cook County, Ill*., 506 U.S. at 68-69. The seizure of the defendant's security cameras here thus exceeded the scope of the search warrant and was "conducted outside the judicial process." *Id*.

The violation of the Fourth Amendment in this case requires suppression of all the evidence seized. "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that

---

[8] There is no "exigent circumstance" or emergency exception to the warrant requirement applicable here; to the contrary, the case agent Amy Solek knew of the existence of the security cameras and their function at least two days before and had ample time to either procure a warrant or seek advance permission from the Deputy Director of the FBI to disable the cameras.

exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct…." *Herring v. United States*, 555 U.S. 135, 144 (2009).

As discussed *supra* in Point I, this case is not the first time these agents have unlawfully seized video recording cameras during a search. To allow them to continue to make unsanctioned and unconstitutional incursions into an individual's civil liberties, and then permit them to testify falsely about it, as if they never heard of the DOIG and its directives, invites lawlessness into the courtroom. All of the evidence seized should be suppressed.

III.

THE STATEMENTS MADE BY THE DEFENDANT
TO LAW ENFORCEMENT DURING THE EXECUTION
OF THE SEARCH WARRANT SHOULD BE SUPPRESSED

There is absolutely no doubt that Atiq Butt was questioned by law enforcement while he was in custody and not free to leave. In addition, as of 6:39 p.m. that night Butt was represented by counsel, who attempted to intervene by phone.

At the time of the questions by both Agent Mazzuca and Agent McKeon, firearms had already been found pursuant to the search warrant. Agent Solek was the case agent, and testified that, once guns were found, she knew he was going to be arrested and he was not free to leave. (Solek, 153-154) She spent her time with Butt by filling out a Marshall's form called an Arrestee Information Sheet. (*Id*.) Mazzuca also testified that, when he came upstairs from the basement to question Butt about the firearms and possible handguns, he believed that Butt was going to be arrested. (Mazzuca, 30) After spending two hours in the basement, Agent McKeon came upstairs and exchanged words with Butt about a bullet proof vest. She asked him if he was a convicted

felon. McKeon testified that she believed he would be arrested based on his convictions. (McKeon, 51-52)

A.    At the Time of Questioning by Mazzuca, Atiq Butt Was In Custody

The first discrete inquiry to determine if a defendant is in custody is, what were the circumstances of the interrogation? *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Here, the defendant's house was invaded by about 15 agents to execute a search warrant – meaning that there was already probable cause to believe that there were weapons in the home, and the agents expected to find weapons. Schill and McKeon both testified that they knew Butt had a prior felony conviction, which would make possession of even legal weapons a crime. (Schill, 36; McKeon, 51) Mazzuca was in the basement when guns were found, and he immediately came up to ask Butt what he used them for and where the handguns were. (Mazzuca, 29-30) Under these circumstances, where the agents not only expected to find weapons but did find weapons and knew about Butt's felony conviction, there was no doubt Butt was going to be arrested and hence, not free to leave.[9]

The second discrete inquiry for custody is, given those circumstances, would a reasonable person have felt that he was not free to terminate the interrogation and leave? *Thompson v. Keohane*, *supra* at 112. According to the defendant, he was patted down and made to sit on the couch in the living room and told not to move. Within 10 minutes of the agents' entry Mr. Butt heard them say, "We hit the motherlode" and saw agents high fiving each other. He knew at that moment that he was going to be arrested. (Butt, 95-96) Further, the defendant was prevented getting up from the couch; prevented from talking to his attorney, prevented from using his cell phone, separated from his wife, and continually surrounded by at least three to five agents. After

---

[9] Agents Solek, Mazzuca, Prout, and McKeon all admitted that, after guns were found, he was not free to leave. (Solek, 153; Mazzuca, 30; Prout, 93; McKeon, 52) Solek specifically stated she planned to arrest him and that there was "no particular reason" that she did not read or advise Butt of the Miranda warnings. (Solek, 155)

the "motherlode" comment, and given all of the restrictions on his movement, Butt reasonably felt that he was not free to leave.

*United States v. Ali*, 68 F.3d 1468 (2d Cir. 1995) is the case closest on point to the instant facts. There, the defendant was boarding a flight at JFK with weapons in his baggage, which he had not declared, and which were seen on the x-ray scan. Six customs agents – five in uniform with weapons visible – pulled him out of the boarding line to an adjacent corridor to question him, but they did not give him Miranda warnings. Two agents testified at the suppression hearing; one stated unequivocally that the defendant was not free to go when the agents pulled him out of line. The other agent was less forthright, stating that he wasn't arrested but was not allowed to board the plane, and did not demand to leave. The agent finally testified that, if the defendant had attempted to leave, he wouldn't have allowed him to run away. The district court did not suppress the statements, analyzing the behavior of the customs agents as a *Terry*- like stop (*Terry v. Ohio*, 382 U.S. 1 (1968).

The Second Circuit identified the proper standard:

> The proper inquiry is thus whether a reasonable person in Ali's shoes would have felt free to leave under the circumstances. The "goals" of the agents' questions (a factor upon which the district court relied), to the extent they were communicated or evident to the defendant at all, do not support the view that defendant should have felt free to leave; to the contrary, the questions suggested that the officers already knew Ali had weapons in his baggage and that they were not about to let him go at all. 68 F.3d at 1473.

The government petitioned for a rehearing after the court reversed and remanded. Upon rehearing, the court definitively held that, given the agents' conduct in pulling Ali out of the line, combined with the testimony of the two agents who expressed the opinion that he was not free to leave, "a reasonable person in Ali's shoes would not have felt free to leave. Ali was thus in custody,

and Miranda warnings should have been given." *United States v. Ali*, 86 F.3d 275, 277 (2d Cir. 1996).

For these reasons, the defendant's statements to both Mazzuca and McKeon should be suppressed.

B.    The Right to Counsel Attached When William Sayegh Called and
      <u>Attempted to Speak to Agents to Advise Them Not to Question His Clients</u>

In addition, Mr. Butt's right to counsel attached when attorney William Sayegh phoned Ms. Costa in response to her text and tried to speak to agents at the house.

At 6:39 p.m., well after guns were found, but before McKeon returned upstairs from the basement, William Sayegh attempted by phone to speak to an agent, in order to inform him or her not to question Mr. Butt. No agent would take the phone from Ms. Costa to speak to him. Nor was he able to speak to the defendant, since Ms. Costa was not permitted to leave the room she was in. (Sayegh, 73-74) Mr. Sayegh's firm represented the Butts on two civil matters at the time (Sayegh, 65) and he believed he was engaged on behalf of both Ms. Costa and Mr. Butt at the time he was speaking to Ms. Costa. (Sayegh, 82-83) Mr. Sayegh directed one of his associates, Brian Rudner, to be in court for Mr. Butt the following morning, and in fact Butt was represented by the firm at arraignment the next day. (Sayegh, 83) The defendant's right to counsel attached at the time Mr. Sayegh called and tried to speak to an agent.

"In *Michigan v. Jackson*, 475 U.S. 625 (1986), the Supreme Court adopted the prophylactic rule that once a defendant invokes his Sixth Amendment right in a government-initiated interrogation, any subsequent waiver of that right is presumed invalid, even if the waiver is knowing and voluntary. Id. at 629–32. Statements elicited in violation of this rule are inadmissible in the government's case-in-chief." *United States v. Abdi*, 142 F.3d 566, 569 (2d Cir. 1998).

Here, Mr. Sayegh attempted to invoke Mr. Butt's Sixth Amendment right to counsel by asking to speak to an agent on the scene. No agent would take the phone from Ms. Costa, but Mr. Sayegh could hear her stating that their attorney, William Sayegh, was on the phone and wished to speak to one of them. The refusal of the agents to speak to him was a deliberate act to deny the defendant his right to counsel.[10] Because of this, the statements made by the defendant to Agent McKeon must be suppressed. *United States v. Morrison*, 449 U.S. 361 (1981); *United States v. DiGregorio*, 795 F.Supp. 630 (SDNY 1992).

Conclusion

For all of the above reasons, Atiq Butt respectfully requests that the within motions be granted, and for such other and further relief as to this Court seems just and proper.

Respectfully submitted,

*S/S*

Camille M. Abate, Esq.
Attorney for Atiq Butt

---

[10] It is respectfully submitted that Mr. Sayegh, a well-regarded attorney, was credible in his testimony about trying to speak to the agents, whereas the agents in this aspect of their testimony, as well as with the security cameras, were less than forthright and indeed incredible in some of their statements.