UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC ...
DOCUMENT
ELECTRONICALLY F...
DOC #:
DATE FILED: 2/6/2019

UNITED STATES OF AMERICA,

    -against-

ATIQ BUTT,

               Defendant.

18-CR-00087 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Defendant Atiq Butt ("Defendant" or "Butt") was indicted on February 5, 2018 for six counts of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (*See* ECF No. 6.) On September 30, 2018, Defendant filed a motion, seeking to: (1) suppress all statements taken in violation of his constitutional rights under the Fifth Amendment pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), and the Sixth Amendment right to counsel; (2) request a hearing to address supposed falsehoods in a search warrant executed at Defendant's home on December 13, 2017 pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674 (1978); and (3) suppress all evidence seized during the execution of that search warrant as a violation of his Fourth Amendment rights. (ECF No. 30.)

On October 1, 2018, I issued an Opinion and Order, granting in part and denying in part Defendant's motion. (ECF No. 37.) I granted it insofar as Defendant's request for a *Franks* hearing, and denied it as far as suppressing any statements until after the hearing. (*Id.*) Subsequently, on November 6, 2018 and November 27, 2018, I held a hearing to assess the *Miranda*, *Franks*, and Fourth Amendment issues. (*See* ECF Docket Entries dated 11/06/2018 and 11/27/2018.) At the end of the hearing, I issued a ruling from the bench, denying the *Franks* issue and permitting the parties to provide additional briefing on the *Miranda* and Fourth Amendment

issues. (*See* Docket Entry dated 11/27/2018.) I also permitted Defendant to brief a novel claim based on an alleged violation of his due process rights under the Fifth and Fourteenth Amendments. Both parties timely filed their moving papers.

Presently before the Court is Defendant's motion to: 1) suppress any statements taken in violation of his constitutional rights under the Fifth and Sixth Amendments; (2) suppress all evidence seized during the execution of the search warrant based on a violation the Fourth Amendment; and (3) waive the indictment based on a violation of his constitutional rights under the Fifth and Fourteenth Amendments. (ECF No. 45.)

For the following reasons, Defendant's motion to suppress is GRANTED in part and DENIED in part. It is granted insofar as suppressing Defendant's statements pursuant to *Miranda v. Arizona*. It is denied as far as: (1) suppressing any evidence seized during the execution of the search warrant pursuant to the Fourth Amendment of the Constitution and (2) waiving the indictment, pursuant to the Fifth and Fourteenth Amendments of the Constitution.

## BACKGROUND

Before this Court are several novel questions about the proper execution of search warrants. Because this Court is only addressing a narrow set of open issues, the factual findings below are those that are necessary to decide the instant issues. They are based on the undisputed testimony presented at the hearing and the Court's credibility determinations.

### I. Investigation Leading up to Execution of Search Warrant

In or about December 2017, agents working for the Federal Bureau of Investigation ("FBI") began investigating Butt while conducting a separate investigation on public corruption. (Schill Tr. at 14; 34-45). During the public corruption investigation, FBI agents began conversing with an individual named Nathaniel MacElhinney ("MacElhinney"), whom they learned to be

Butt's brother-in-law. (*Id*. at 15.) Through conversations with MacElhinney, the FBI began to suspect that Butt was a felon possessing firearms, and that Butt had used MacElhinney and other individuals to assist him with unlawfully purchasing firearms. (*Id*. at 15-17; 48-55.) After learning more about the types of firearms that Butt potentially possessed, as well as where they were purchased and were likely located, on December 13, 2017, FBI agents prepared affidavits to secure a search warrant for Butt's home. (*Id*. at 22.) On December 13, 2017, Magistrate Judge Paul E. Davison signed the warrant and authorized the seizure of firearms, ammunition, and related items. (*See* Ex. 3504-01 at 6.)

## II.    Execution of Search Warrant

On the evening of December 13, 2017, at about 5:00 p.m., about 16 law enforcement officers from the FBI, Department of Justice-Office of Inspector General ("DOJ-OIG"), Bureau of Alcohol Tobacco, Firearms, and Explosives ("ATF"), and Putnam County Sheriff's Office ("PCSO") executed the search at Defendant's home, located at 142 Shindagen Hill Road, Carmel, New York. (Schill Tr. at 22; 28; Solek Tr. at 117-120.)

The search began when agent Amy Solek ("Solek"), a Special Agent with the FBI, along with a Putnam County sheriff's investigator, approached Butt's home under the rouse of needing to ask questions related to Butt's daughter, who was under an order of protection. (Solek Tr. 116-19,121-22, 141-43.) Butt allowed Solek and the investigator into the house and sat with them in the living room, where they began to speak about the order of protection and a family court case that was pending. (*Id*. at 121.)  About 10-15 minutes later, other law enforcement officers who had been waiting outside, came to the door, which Butt answered. (*Id*. at 121-22, 143.) Once Butt let the officers into his home, the search began. (*Id*. at 122.)

The officers conducted a quick protective sweep, after which many descended to the

basement, where the firearms were believed to be located. (*Id*. at 123). Solek, however, remained in the living room with Butt throughout the search. (*Id*. at 123-24.) According to Solek, no one patted Butt down up to that point because she had entered the home under the rouse of needing to discuss family law matters. (*Id*. at 122, 144). Additionally, Solek testified that no one used force in getting Defendant to return to the living room or to sit back down on the couch after he answered the door. (*Id*. at 123). Another FBI Agent involved in executing the search warrant, Kristin Schill ("Schill"), testified that, as far as she knew, Butt remained on the couch throughout the entire search. (*Id*. at 64) ("Q: And every time you walked by, he was seated on the same couch; is that right? A: That's my only recollection.").

After the officers entered, Butt and his wife were separated and remained separated throughout the search under the supervision of different officers. (*Id*. at 124, 126) ("They initiated a search. One person, being myself, remained with Mr. Butt, and another person remained with [Butt's wife] Willomena Costa so that they weren't caught up in the search and wandering around. Someone stayed with each one of them.") (*Id*. at 151) ("Q: And you testified that you remained with Mr. Butt and another agent remained with Willomena Costa; is that right? A: Yes.") Another agent, Heather McKeon ("McKeon"), also testified that Butt and his wife remained separated and supervised throughout the entire search, as part of general procedural protocol. (McKeon Tr. at 56-57.) Additionally, due to the layout of the home, various officers approached and conversed with Butt and Solek throughout the search. (Solek Tr. at 126, 156; Schill Tr. at 27.)

While Solek remained with Butt in the living room, she took his pedigree information and prepared a form for the U.S. Marshall's Service. (*Id*. at 127, 152, 168.) Solek testified that she did not tell Butt that he was under arrest or tell him that he had to remain seated and could not get up or leave. (*Id*. at 127.) Solek also never told Butt that he was *not* under arrest, that he was *free* to

get up and leave, that he did *not* need to speak with her or answer her questions; and nor did she explain *why* she was soliciting pedigree information from him. (*Id.* at 127-28, 168). Solek also testified that she knew that the form she was filling out was the required paperwork for an "arrestee" and that the minute a firearm was found, Butt would not be free to leave. (*Id.* at 154.) During the search, she spoke with Butt "continuously while [she] was filling out the form, and then periodically afterward.") (*Id.* at 128.)

### III.    Disabling Surveillance Cameras During the Search

Solek and another FBI Special Agent, Michael Mazucca ("Mazucca"), testified that at some point during the beginning of the search, officers disabled Butt's video camera surveillance system. (Mazucca Tr. at 25-26.) Solek testified that she noticed Butt's surveillance system a previous time she had visited and that on December 13, 2017, at some point after the search began, the surveillance system was turned off as part of "general protocol." (Solek Tr. at 145-46.) Solek could not, however, identify the source of the protocol. (*Id.* at 146) ("Q: In other words, is it in writing somewhere that when you come into a house that has video surveillance, you were directed to turn off the video surveillance? A: I do not know if it is in writing.") She added that she was not the one who decided that the surveillance system would be turned off, nor the individual who disabled it. (*Id.* at 146.) Rather, she stated that she became aware that someone else turned it off. (*Id.* at 147.)

Mazucca testified that the agency pays special attention to security cameras during the clearing process used in executing a search warrant (Mazucca Tr. at 5.) He explained that it is done for a multitude of reasons, the primary one being safety, since, with wireless technologies, recordings can be transmitted to people who may be monitoring or watching the protocol for tactical or conversational purposes. (*Id.* at 6.) Mazucca testified that he did not disable the camera

system himself and nor did he ever read the search warrant application. (*Id*. at 7, 28.) He also testified that, based on his years of service to the agency, he believes that it is general protocol for the FBI to disable cameras found at search locations. (*Id*. at 26-27.)

## IV. Questioning During the Search

During the time that Solek sat with Butt in his living room, it is undisputed that several agents came up and asked Butt questions about the items that they were locating in his home. (Solek Tr. at 128; Schill Tr. at 30); (Solek Tr. at 162) ("On occasion, they were asking for clarification about the things they were finding in the basement."). Specifically, Solek recalled that Mazucca came up and asked Butt about handguns since they found ammunition for handguns but no handguns themselves. (*Id*. at 128-29) ("They asked [Defendant] if he had handguns because they had found ammunition for handguns.") (*Id*. at 154) ("[Mazucca] asked who the rifle belonged to; was Atiq Butt aware that it was in the basement and who would use it, or you know, if Atiq had ever shot the gun."); (*Id*. at 162) ("Q: They asked him questions, expecting answers from him, right? They were trying to elicit answers from him about the guns, correct? A: Well they were trying to find out information about, you know, who owned them and things like that, yes. Q: And who used them as well, right? A: That was a question, yes.") At this time, in addition to knowing that ammunition for handguns had been found, Solek testified that she heard that officers had also located at least one rifle. (*Id*. at 128-30) ("Michael Mazzuca asked Atiq Butt if he was aware that there were firearms in his basement. Obviously, the rifle was included. Atiq Butt said that he was aware and that the firearms belonged to his brother-in-law. And Mike Mazzuca asked Atiq Butt if he had ever fire the firearms and Atiq Butt said that, on occasion, he and his brother-in-law went target practicing in the backyard.")

Solek further testified that when this conversation occurred, no one had provided Butt with

any *Miranda* warnings. (*Id*. at 133) ("Q: Had you provided or anyone provided Mr. Butt his Miranda warnings when he made the statement about shooting in the backyard?"; A: No."). Mazucca also testified that, at the time he questioned Butt, he did not know whether he had been given *Miranda* warnings, but that he did believe that Butt was going to be arrested at the end of the search. (Mazucca Tr. at 30.) The general substance of the questioning was corroborated by Schill, who also testified that she overheard a conversation with Butt in which he disclosed information about shooting firearms. (Schill Tr. at 30) ("I overheard some mention…of, like, target shooting. And I just remember, like, hearing that and going, like, in my head, Oh, that's good.").

## V. Defendant's Arrest and Miranda Warnings

Solek testified that some time shortly before 8:00 p.m. (which is about when everyone departed), there came a time when it was decided that Butt would be arrested. (Solek Tr. at 134, 160.) At that point, Butt left the living room and went upstairs to change. (*Id*. at 134.) Just before he went upstairs, Solek testified that she read him his *Miranda* rights for the first time. (*Id*. at 134.) She also provided him with a *Miranda* waiver form, which he signed. (*Id*. at 134.) Solek further testified that she knew that prior to her giving Butt his *Miranda* rights at the end of the search, no one else had given them. (*Id*. at 133-34) ("I was the only one."); (*Id*. at 140) ("Q: Was that near the beginning, middle, or end of the search? A: It was nearing the end of the search."). She also testified that there was no particular reason that she had not read him his *Miranda* rights earlier (*Id*. at 155) ("Q: Is there a reason why you did not advise Mr. Butt of his rights at the time the firearms were found? A: There wasn't any particular reason, no.").

Importantly, during her testimony, Solek admitted that there were several inaccuracies regarding her issuance of *Miranda* warnings that she memorialized in the criminal complaint. For example, she admitted that paragraph 5 of the complaint reflects that Butt made certain statements

about shooting in his backyard *after* being read his *Miranda* rights, when in fact, she recalled him making them before being given his rights. (*Id*. at 136, 163-64). Similarly, whilst the complaint reflects that Butt stated that he would shoot while wearing his bulletproof vest, Solek testified that she did not actually recall him ever saying anything about *wearing the vest while shooting*. (*Id*. at 137.) Her explanation for these inaccuracies was that she "did not read paragraph 5 as closely as [she] should have before swearing to it.") (*Id*. at 138.)

## VI. Other Relevant Testimony from the Hearing

### a. Christopher Prout

Another witness who testified on behalf of the Government was Special Agent for the DOJ, Christopher Prout ("Prout"). Prout testified about the investigation that lead to the issuance of the search warrant and the initial steps that law enforcement went through on December 13 at Butt's home. (Prout Tr. at 79.) He described the general protocol of having to conduct an initial protective sweep or "clear the house." (*Id*. at 79.) He also confirmed that when he entered the house, Butt was in the living room seated on the couch, not wearing handcuffs, and that no one had their hands on him, or had weapons drawn, or were employing physical force. (*Id*. at 80, 82.) He also testified that although he primarily engaged in the search, he heard parts of conversation between Solek and Butt—for example, regarding Butt's business. (*Id*. at 82.) Regarding the physical constrains on Butt, Prout testified that he never saw Butt surrounded by six agents nor did he see or hear anyone instruct Butt that he was not free to leave. (*Id*. at 83.) Importantly, Prout also testified that by the time he had arrived at Butt's house during execution of the search warrant, there were already agents downstairs in the basement who had seized firearms and that, based on his knowledge, there was probable cause to arrest Butt; so if Butt had requested to leave the premises at that time, he would not have allowed him to do so. (*Id*. at 93.)

### b. Mike Mazucca

Mazucca testified on the behalf of the Government as well. He testified that Butt was in the living room with other agents at the beginning of the search and that no one seemed to be yelling or using physical force on him. (Mazucca Tr. at 8.) Mazucca testified that he never saw Butt leave the living room and only saw Butt move between the living room table and sofa, while basically remaining on the couch throughout the search. (*Id*. at 10.) Mazucca testified that he did come up and question Butt during the search once agents began finding ammunition that did not match the long guns that they were finding. (*Id*. at 11.) Specifically, Mazucca admitted that he asked about the ammunition and guns they were recovering:

> So, I went upstairs and asked Mr. Butt—told Mr. Butt, you know, we found long guns and bullets that didn't match the long guns, so, you know, where is the handguns? And Mr. Butt didn't advise that there were handguns there. And I inquired, I said, what do you use these big guns for, hunting? And Mr. Butt says, oh no, no, we use them for target practice. And I said, you shoot these long guns here near the house? He says, no, in the back. The property is very long. It's big. I said, with the houses around there? And he says, yeah, we go back. You know, we – it was a large property. And then I inquired again, you know, Mr. Butt, where is the handguns? We have bullets that don't match the long gun. And he didn't respond that there were handguns.

(*Id*. at 12-13.) Mazucca testified that he was not sure whether there were any other officers who asked questions at that point or whether there were any other officers present when he was asking Butt questions. (*Id*. at 14.) He also described his tone as "matter of fact" and "direct." (*Id*. at 14.) Finally, Mazucca testified that at the time he came up to talk to Butt, if Butt had tried to leave, he did not believe Butt would have been able to make it out. (*Id*. at 31-32.) Although Mazucca testified that the questioning lasted less than ten minutes, he also testified that many of the officers conducting the search were armed and that no one told Butt that he was free to leave at any point. (*Id*. at 33-38.)

### c.  Heather McKeon

McKeon, a special agent with the ATF for 17 years, took the stand on behalf of the Government as well. She testified that because she was a female officer, when she entered Butt's home she was told to sit with Butt's wife, Willow Costa ("Costa"), in a separate room while the house was being cleared. (McKeon Tr. at 41.) McKeon also testified that she never saw anyone using force on Butt and that, over the span of about two hours, agents recovered thousands of rounds of ammunition in Butt's basement. (*Id*. at 42-43.) Finally, McKeon also testified about a bulletproof vest that agents recovered during the search. Specifically, she testified that after certain agents found a bulletproof vest in Butt's home, they came to her and asked if they could take it, to which she responded that they could. (*Id*. at 44.) Then, Butt—who at that point was still sitting on the couch—joined the conversation and asked aloud why he could not have a vest,[1] in response to which McKeon asked if he was a convicted felon. (*Id*. at 44.) When Butt responded yes, she told him that he could not have a bulletproof vest, although she later admitted that she was mistaken in giving that answer since Butt had never committed a violent crime. (*Id*. at 44, 50.) At that time, she testified that there were two other agents sitting with Butt. (*Id*. at 45.)

Subsequently, McKeon went to Costa and asked if the vest belonged to her. (*Id*. at 45.) McKeon testified that Costa's response was that "it's not her vest, but she purchased it online and had it shipped to them." (*Id*. at 45.) McKeon also testified that all conversations about ownership of the bulletproof vest occurred *after* agents had already found arms in the basement and that based on his prior convictions, she believed that Butt was going to be arrested at some point. (*Id*. at 51-52.) Finally, McKeon testified that, in dealing with Costa, while she never outright prevented Costa from handing a phone to Butt at any point, she had told Costa not to use a phone in the beginning,

---

[1] During the hearing, Defendant noted that while McKeon testified that Butt said: "Why can't I have *my vest*?" her written notes from the incident itself reflected that Butt said: "Why can't I have *a vest*?" (McKeon Tr. at 47-48.)

and never really discussed whether Costa was permitted to use her phone later on after the premise was secure. (*Id*. at 58-59.)

### d. Nathaniel MacElhinney

Defendant's brother-in-law, Nathaniel MacElhinney ("MacElhinney") also took the stand. Due to being a named Defendant in another proceeding, MacElhinney invoked his Fifth Amendment right to remain silent in response to most questions. MacElhinney did relay that he had spoken with FBI agents on December 11, 2017, (MacElhinney Tr. at 111), and that he was familiar with the location of Defendant's home, where he had been more than once. (*Id*. at 109.)

### e. William Sayegh

Another person who testified was William Sayegh, an attorney of 29 years, who claimed to be Defendants counsel. Sayegh testified that on December 13, 2017, while riding a motorcycle in Florida, he received a text message and then phone call from Costa, who explained that there were "these people in the home, various law enforcement agencies; that they had separated her from [Butt]; that they had … unplugged electronics that are in the building; and separated her from her husband and won't let her speak to her husband." (Sayegh Tr. at 69.)[2] Sayegh testified that he spoke to Costa at least four times on the evening that the search warrant was executed and that he spoke to her on both her phone and on Butt's cell phone number. (*Id*. at 71-72) ("When I got the text, I called [Costa]. [Costa] told me the short of what had happened. After that, I called [Butt] on his phone to try and reach him, and [Costa] picked up that phone. Because she had both phones with her.") Sayegh also testified that he asked to speak to an agent but that no one would listen to [Costa] or speak with him. (*Id*. at 73):

---

[2] Sayegh could not recall whether he called Defendants' wife, Willow Costa, back or whether she called him back. (*See* Sayegh Tr. at 69). For the present motion, the Court finds this fact irrelevant.

Q: Did you ask to speak to an agent?
A: I did. I asked her to put the agent on the phone. She was calling out to them. She said they were ignoring her.
Q: What did you hear her call out?
A: She said, my attorney, William Sayegh, is on the phone. He'd like to speak with you. Can you please take the phone?
Q: And what happened after she said that?
A: She kept repeating it to them. They were—she told me—I didn't hear them, that they were ignoring her and not paying any attention to her.
Q: What was your intention in talking to the agents?
A: To ask the agents not to speak with either of my clients; to conduct the searches, they need to do so lawfully and not to speak with my clients with regard[s] to this matter.

Sayegh also testified that he instructed Costa to go over to the agents and that he heard Costa trying to yell over the agents to Butt; Costa then told Sayegh that Butt could not hear her. (*Id*. at 74.) He added that he told Costa to tell the police officer that he was Butt's attorney, but that that they wouldn't respond to her, which is what prompted him to call Butt directly. (*Id*. at 74.) Sayegh testified that "no one would get on the phone with [him]" and ultimately, he "never spoke with Butt," even though he heard Costa constantly trying to call to Butt. (*Id*. at 76-77.)

**f. Atiq Butt**

Finally, Butt took the stand in his defense. He testified that at the beginning of the search, after Solek sat with him for four or five minutes, he went to answer the door and "a bunch of people started coming in, coming in constantly like a train" and Mazucca "started yelling and screaming at [him]"—telling him "sit down on this corner. Do not move." (Butt Tr. at 90.) After that, Butt claimed that he was not allowed to move and that he felt scared because he had no idea what was going on. (*Id*. at 91.) Butt also claimed that his sofa was checked and that he was patted right at the start of the search, and that it was while Mazucca was patting Butt that he told Butt not to move during the entire search. (*Id*. at 90-92.) Because he was "baffled," and Mazucca told him to sit on the couch, and no one ever told him that he could get up and move, Butt testified that he

believed he could not get up nor move. (*Id*. at 92.)

Indeed, the testimony reflects that Butt never got off the coach, let alone out of the confines of his living room, where Solek sat with him and asked him questions throughout the search warrant execution. Butt also testified that he had about twenty surveillance cameras set up in his home, including in the living room where he was seated. (*Id*. at 92.) He further claims that he saw Mazucca yank the wire going to the cameras. (*Id*. at 93.) He added that Mazucca even looked around and then asked Butt "where is the system to disable the cameras?" (*Id*. at 93.)

Butt also testified that he did not ask to speak to any attorney and that he heard Costa speaking to Sayegh on the phone, but that Solek did not let Butt speak to anyone and "did not let me use a phone." (Butt Tr. at 94.) (Q: "What is it—so what did that lady say to you? A: She said I cannot use the phone.") Butt testified that, in fact, he did not even know what happened to his phone. (*Id*. at 93.) He repeatedly testified that he did not feel that he could leave because "they said that I cannot get up from the sofa" and "they told me I cannot move from there." (*Id*. at 95.) Additionally, Butt said he could overhear their conversations regarding what they found in the basement. For example, he heard them say: "We hit the motherload" and give high fives to each other, at which point "he knew where [the search] was going" and that he would be arrested (*Id*. at 95-96.) ("Q: What do you mean you could see where it was going? A: I knew that I was going to be arrested. Q: And how long after you've been sitting on the couch did you hear that 'we hit the motherload' comment? A: About ten minutes, yeah.")

Butt repeatedly testified that no one ever told him that he had the right to remain silent, and that he had not had any contact with the criminal law for at least two decades. (*Id*. at 96.) It was undisputed throughout the hearing that no agents ever told Butt that he was free to move around, speak with counsel, use or possess his phone, leave the room or his premises, or not answer

questions. (*Id*. at 97) ("No, they wouldn't tell me anything else.") Butt also claimed that when Mazucca came to him to ask about the handguns, "he was yelling and screaming, 'Where are the handguns? Where are the handguns' And I said 'We don't have any handguns.' And he kept saying, 'I have twenty people over here. We are going to search all night and we are going to search the barn and this.'") When Mazucca was supposedly screaming, Butt said that there were four to five people also screaming at him, and there was always at least one person with him at all times. (*Id*. at 97.) He also said that no one besides Mazucca asked him questions and that he did not see anyone with weapons. (*Id*.) Butt added that he never got up from the couch because at the beginning of the search, at least two times, Mazucca said: "Don't let him get up from there. Don't let him get up from there" in front of other agents. (*Id*. at 105). Butt claimed that while he could occasionally hear Costa in the other room, he couldn't make out what she was saying, and she was not allowed to come to him and speak with him. (*Id*. at 107). Finally, Butt added that he mentioned shooting the guns in his backyard to Mazucca because Mazucca kept asking him questions, annoying him, and bugging him about handguns. (*Id*. at 109-110).

## DISCUSSION

### I.       Disabling Surveillance Cameras

Butt first argues that the destruction of his private surveillance cameras during execution of the search warrant obstructed justice and destroyed his right to a fair trial by "preventing him from offering factual and unequivocal evidence on his behalf," which violated his Fifth Amendment due process rights. (Defendant's Memorandum of Law in Support of His Motions to Dismiss the Indictment and Suppress Evidence, ("Def. Mem.") at 6-10, ECF No. 45.) Butt further argues that when the government destroys evidence in its possession in bad faith without notifying the accused or allowing him to access the evidence, the remedy is dismissing the indictment. (*Id*.)

Finally, Butt argues that there is no valid justification for disabling the videos since: a) he owned and installed the camera system, b) the FBI's Domestic Investigations Operations Guide ("DIOG") does not explicitly endorse disabling such systems, and c) there were no cooperators monitoring the cameras who could pose a safety threat during the search. (*Id*.)

Butt argues that disabling his surveillance camera system also violated his rights since its seizure was not in the search warrant application. (*Id*. at 12.) Specifically, Butt argues that the case can be analogized to 42 U.S.C. Section 1983 cases in which police seize a person's cell phone and erase or delete the video recordings. (*Id*.) Butt adds that the Government's conduct meaningfully interfered with his possessory interest in the security cameras, exceeded the scope of the warrant, made the search unreasonable, and requires suppression of all evidence seized during the search. (*Id*. at 13.)

The Government argues that Butt has presented no case law to support either a Fourth or Fifth Amendment violation and that neither argument is valid because the Government never *possessed* or *destroyed* any existing recordings, never violated FBI policy, and had legitimate safety concerns for the officers conducting the search, which justified disabling the surveillance system. (Government's Post-Hearing Memorandum of Law in Opposition, ("Gov. Opp.") at 40-42, ECF No. 46.)  The Court agrees with the Government.

### A. Legal Standards

The due process clause of the Fifth Amendment may be invoked to suppress evidence, or dismiss an indictment, *see United States v. Yater*, 756 F.2d 1058, 1064 (5th Cir. 1985), when government conduct is "so outrageous," *United States v. Russell*, 411 U.S. 423, 431, 93 S.Ct. 1637, 1642 (1973), that it "reache[s] the level of shocking the conscience." *United States v. Alexandro*, 675 F.2d 34, 40 (2d Cir. 1982); *United States v. Penn*, 647 F.2d 876, 880 (9th Cir. 1980). Because

this rule of law is invoked "when the Government activity in question violated some protected right of the defendant," *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650 (1976), courts "tread gingerly" when faced with arguments that the "fundamental fairness" component of the Fifth Amendment's requires suppressing evidence. *Penn*, 647 F.2d at 880. ("The Constitution was designed to define the boundaries and framework of civilized and orderly government; it is not to be used to convert into a command a judge's every notion of what is morally best.").

The Fourth Amendment provides: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no Warrants shall issue, but upon probable cause. U.S. Const. amend. IV. The Supreme Court has interpreted this language to mean that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Because the Fourth Amendment specifically protects: persons, houses, papers, and effects, privacy rights are closely connected to property rights, and courts analyze the "reasonableness" of people's expectations to privacy differently based on the location and type of search taking place. *Compare Katz v. United States*, 389 U.S. 347, 351 (1967) ("Thus a man's home is, for most purposes, a place where he expects privacy ....") *with United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) ("The Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.").

The two constitutional rights are related as far as Defendant's requests to suppress evidence and dismiss the indictment. That is—for Defendant to make out a due process violation, he must show that the Government violated another protected right, such as the Fourth Amendment, and that it did so in a manner outrageous enough to "reach the level of shocking the conscience." *Alexandro*, 675 F.2d at 40. In the context of searching a home pursuant to a valid search warrant—

particularly one for firearms—Defendant's onus is particularly high because the Fourth Amendment innately balances persons' right to their property against the Government's need to conduct reasonable searches pursuant to warrants. U.S. Const. amend. IV.

### B. Application

Butt has not proven that the search was conducted unreasonably or that it exceeded the scope of the search warrant. While it is true that the search warrant did not explicitly endorse the seizure of Butt's camera surveillance system, the Court finds it inaccurate to describe the Government's disabling of cameras as a "seizure" when the Government did not remove them, possess them, retain custody over them, and disabled them as a procedural safeguard in the context of executing a warrant that was supported by probable cause. Notably, Butt has not provided any case law to support his position and there is authority that goes against his position. *Cf. United States v. Yevakpor*, 419 F. Supp. 2d 242, 250 (N.D.N.Y. 2006) (finding the Government's clear custody of existing records an important factor in the court's assessment of the due process violation.)

Moreover, even if the Court deemed the disabling to be a temporary seizure, there is a distinction between *preventing the creation* of potentially exculpatory evidence and the *intentional destruction* or *manipulation* of existing evidence. This distinction is one that Defendant downplays, and that the Government overemphasizes. For example, both parties discuss *United States v. Yevakpor*, 419 F. Supp. 2d 242, 246 (N.D.N.Y. 2006), a case that involved law enforcement's deliberate destruction of portions of a continuous recording of the defendant. There, the Court ultimately found: a) that it was incumbent on the government to not destroy evidence that it had in its custody and b) that there was a due process violation regardless of the Government's good or bad faith. 419 F. Supp. 2d at 247-49 ("courts have determined that if the

Government fails to disclose or preserve material that could be exculpatory in nature, or favorable to an accused when material to guilt or punishment, good or bad faith of the prosecution is no longer at issue, but rather a due process violation is at issue.")

Importantly, however, there were several important factors that weighed in favor of finding a due process violation in *Yevakpor* that are not present here. The first, as mentioned above, is that in *Yevakpor* there was an existing record that had already been created that would have been discoverable, and it was undoubtedly already in the government's unilateral custody. The second is that, in deleting select parts of the record, the government implicated the "Doctrine of Completeness" which provides that when a party introduces part of a writing or an utterance at trial, the adverse party may require the introduction of any other part to establish the full context. In other words, the *Yevakpor* Court found that manipulating a piece of existing evidence, and therefore preventing the presentation of the complete recording, was especially likely to create a misrepresentation at trial. Third, the *Yevakpor* Court concluded that, based on the totality of circumstances, it could infer that the evidence would have been exculpatory or favorable to the Defendant. *Id*. In the instant case, none of these factors are present.

Another important consideration not lost on the Court is that suppressing evidence is something that courts do as a matter of last resort, not "first impulse" because it generates "substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 126 S. Ct. 2159 (2006). For example, the long-standing exclusionary rule holds that evidence seized in violation of the Fourth Amendment is not automatically excluded. Rather, courts weigh the costs and deterrence benefits of excluding relevant evidence, typically suppressing evidence only "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *United States v. Leon*, 468 U.S. 897, 919

(1984) (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)). For the same reason, the Supreme Court has held that the exclusionary rule does not apply when a search is conducted in good-faith—that is, when officers have reasonably relied on a judicially-issued warrant later learnt to be invalid. *Id.* at 212. Basically, absent a finding of bad faith or egregious misconduct, courts are reluctant to suppress relevant evidence uncovered during legitimate investigations. *See United States v. Yu*, 755 F. Supp. 578 (S.D.N.Y. 1991) (holding that postal inspectors could seize firearms registration certificates and sales receipt during search of desk drawer for documents evidencing wire fraud even though they were not within the scope of the search warrant because they were seized in good faith.)

Here, after the *Franks* hearing, this Court held that the search warrant for Butt's home was valid. (*See* Docket Entry dated 11/27/2018.) Thus, there is already a presumption that the officers' acted in good faith, and not arbitrarily, insofar as disabling the system while trying to safely execute the warrant, which expressly dealt with locating firearms. Additionally, none of the testimony from the hearing reflected that the officers disabled the cameras in bad faith. Rather, all the testimony given by agents reflected that they believed that law enforcement officers are required to disable communication channels that endanger the lives of those executing the warrant. For example, Agent Solek testified as follows:

> Q: Okay and when you came into the house on December 13th, 2017, to execute the search warrant, isn't it true that either you or other agents in your presence dismantled the video surveillance system?
> A: I'm not sure what you mean exactly by dismantled, but we did turn them off; yes.
> Q: And what was the reason for that?
> A: It's just general protocol.
> Q: Whose general protocol?
> A: The FBI's or law enforcement.
> Q: In other words, is it in writing somewhere that when you come into a house that has video surveillance, you were directed to turn off the video surveillance?
> A: I do not know if it's in writing.

(Solek Tr. at 145-46.)

Similarly, Agent Mazucca relayed the following when asked what the first thing is that a search warrant team does when they are executing a search of a home: "Well, generally, you approach the location. You have certain people test—do certain things, secure the outside perimeter. And then entry agents would go in, announce why we're there and then secure the interior." (Mazucca Tr. at 5.) More specifically, Mazucca relayed the following:

> Q: Is it—is your testimony on direct that this is something—dismantling security cameras, and your words were that you want to make sure that the cameras are disabled—is this something that you are testifying is a protocol that you use every time?
> A: If there are cameras at a search location, we would try to have them disabled
> Q: And where do you get your authority from for that?
> A: Just the authority to keep agents and other individuals safe.
> Q: So this is your individual action?
> A: I would turn off a camera that may display a recording of what's going on to a person that could be of danger to us.
> THE COURT: Can you clarify? You indicated before that this is a practice of yours based on your –whatever number of years you've been on—with the FBI executing search warrants?
> A: Correct.

(Mazucca Tr. at 25-26.) Even Agent Prout testified that the first thing law enforcement needs to do when they search a house is to "clear the house" meaning "go through the house, making sure, you know, everyone is accounted for. There's not somebody upstairs hiding with a gun, looking to hurt a law enforcement or disrupt the search." (Prout Tr. at 79.)

The Court finds that the testimony, as well as basic common sense, reflects that when conducting the search of a home, particularly one believed to be housing an arsenal of firearms, there is nothing atypical—let alone malicious—about needing to clear the space and take precautionary measures to ensure the safety of the officers. And whilst certain conduct may not have ultimately been necessary and may have come at a high cost to the Defendant, there is no

way that the officers could have known prior to conducting the search that the surveillance system would not pose a danger to the officers' lives. Put simply, the safety concerns and exigency of the situation favor the officers' conduct.

Accordingly, despite Defendant's argument that the warrant and DIOG Policies did not endorse seizing or disabling cameras, the Court finds that such conduct was more akin to a protective sweep, which is done to ensure the safety of the law enforcement officers who are making on-the-fly judgment calls, rather than the willful possession and destruction of evidence to create a stilted evidentiary record. Therefore, Defendant's motion to suppress evidence based on an unreasonable search in violation of the Fourth Amendment is denied.

The Court does not fully rest its analysis here because Defendant could still make a due process argument about fundamental unfairness that is untethered to the Fourth Amendment and rests on the argument that potentially exculpatory evidence was prevented from being created. This argument is still too tenuous to reach the level of being so outrageous that it "shocks the conscious." *Alexandro*, 675 F.2d at 40. Not only has the Court rejected the notion that the officers acted in bad faith, but ultimately, the Court makes its assessment about the egregiousness of the process based on the totality of facts. *See Penn*, 647 F.2d at 880 ("We hold, however, that it does not, although we disapprove of the police tactic used here. Due process arguments are to be 'tested by an appraisal of the totality of facts in a given case.'").

 At the end of the day, the Court finds that there is little dispute about the central events that transpired during the execution of the search warrant. All parties agreed that the surveillance system was disabled at the onset, Butt and his wife were intentionally separated into different rooms, they remained supervised by different officers throughout the search, a safety sweep was conducted inside and outside the premises, and about ten minutes into the search, after finding

rifles downstairs in the basement, Mazucca returned to Butt and questioned him about the handguns and other firearms. The parties also do not really dispute the amount of physical force that was employed. There were certainly differences in some of the testimony regarding the express and implied instructions that officers gave Butt as far as what he could do and where he could go during the search. There were also some differences regarding whether officers prevented Butt from being able to speak with Costa or his attorney Sayegh. But, as will be discussed next, these Fifth and Sixth Amendment issues are matters the Court can resolve without surveillance footage.

Accordingly, though footage of the full search would certainly have been beneficial, absent any evidence that the missing footage was detrimental to Butt, the Court need not suppress the evidence that was found during the search, nor dismiss the indictment. Accordingly, Defendant's due process argument is denied.

## II.    Suppression of Statements Based on Fifth and Sixth Amendment Violations

The Court next addresses whether Butt's inculpatory statements about possessing and using certain firearms ought to be suppressed due to violations of the Fifth Amendment through *Miranda v. Arizona*, 384 U.S. 436 or the Sixth Amendment Right to Counsel.

Defendant argues that that "[t]here is no doubt that [he] was questioned by law enforcement while he was in custody and not free to leave." (Def. Mem. at 14.) Primarily, he relies on *United States v. Ali*, 68 F.3d 1468 (2d Cir. 1995), a case in which a defendant was at an airport and was not given *Miranda* warnings prior to be questioned, and where the court held that he was in custody and should have been given *Miranda* warnings. (*Id*. at 16.) Defendant also argues that he was deprived of his Sixth Amendment Right to Counsel when attorney William Sayegh spoke to Costa, tried to reach Butt, and relayed that he was Butt's attorney. (*Id*. at 17.)

The Government argues that Defendants oversimplify the *Miranda* analysis, and that Defendant was never entitled to *Miranda* warnings before the questioning because he was not under formal arrest and his freedom of movement had not been curtailed to the degree associated with a formal arrest. (Gov. Opp. at 14.) As to Butt's right to counsel, the Government argues that it was never violated because Butt never asked to call his attorney and certain testimony reflects that when Butt was given the opportunity to speak with Sayegh, Butt himself stood up and indicated that he did not wish to speak to an attorney. (*Id*. at 39.) Though a close call, both factually and jurisprudentially, the Court agrees with Defendant.

### A. Legal Standards

Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights. *Miranda v. Arizona*, 384 U.S. 436. "'[C]ustody' for *Miranda* purposes is not coterminous with ... the colloquial understanding of custody." *United States v. FNU LNU*, 653 F.3d 144, 152–53 (2d Cir. 2011). In determining whether a suspect was in custody, a court looks at all the surrounding circumstances. *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016). The relevant inquiry is "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The test for determining custody is an objective inquiry that asks (1) "whether a reasonable person would have thought he was free to leave the police encounter at issue" and (2) whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004) (citing *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)).

Although both elements are required, the second is the "ultimate inquiry" because a "free–

to–leave inquiry reveals only whether the person questioned was seized." *Newton*, 369 F.3d at 672 (internal quotation omitted). An individual's subjective belief about his or her status generally does not bear on the custody analysis. *Faux*, 828 F.3d at 135. Nor do the officers' perceptions, although they "bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," but "only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526 (quotation marks and citations omitted).

An individual who understands that his detention is "not likely to be temporary and brief" and feels that he is "completely at the mercy of police" could reasonably deem his situation comparable to formal arrest. *Newton*, 369 F.3d at 675 (quoting *Berkemer*, 468 U.S. at 437–38, 104 S.Ct. 3138). Relevant considerations include: (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (internal citations and alterations omitted). Ultimately, however, all factors must be weighed, and no one factor is dispositive; rather the court must assess whether the circumstances would tend to make an individual reasonably feel as though they were being questioned in a police-dominated setting. *See Newton*, 369 F.3d at 675 (explaining that the animating concern behind the various factor tests used to assess "custody" for *Miranda* purposes is coercive interrogation techniques.)

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel includes "an absolute right under the Sixth Amendment to be represented by an

attorney who has no conflict of interest." *United States v. Curcio*, 680 F.2d 881, 885 (2d Cir. 1982).

**B.  Application**

To begin with, it is uncontested that Butt was never advised of his *Miranda* rights until the very end of the search, (Solek Tr. at 133-40), and it is undisputed that the questioning constituted an "interrogation" because Mazucca expressly questioned Butt about incriminating activities. (*See* Solek Tr. at 128-30, 154-62; Butt Tr. at 97); *See Rhode Island v. Innis*, 446 U.S. 291, 300–302, 100 S.Ct. 1682 (1980) (defining interrogation as "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response"); *Faux*, 828 F.3d at 135 (same). Accordingly, the only contested issue is whether Butt was "in custody" for *Miranda* purposes at the time he was questioned.

The court begins with the first part of the objective inquiry that asks whether a reasonable person would have thought he was free to leave the encounter at issue. *Newton*, 369 F.3d at 672. The Court finds that the answer to this question is an obvious no. The undisputed evidence reflected that on December 13, 2017, within 10-15 minutes of Solek entering Butt's house under the rouse of discussing family law matters, about 16 law enforcement officers deriving from four different agencies entered Butt's home and immediately began spreading through the home to execute the search warrant. (*See* Schill Tr. at 22; 28; Solek Tr. at 117-120; Butt Tr. at 90). Butt was separated from his wife and directed to his living room, where he remained throughout the search with Agent Solek at his side the entire time—often asking questions and taking pedigree information from him. (Solek Tr. at 127, 152, 168; McKeon Tr. at 56-57; Schill Tr. at 124, 126.) Butt did not have his cell phone and was *not* told that he was free to leave, call an attorney, or that he could refrain from answering questions. (Solek Tr. at 127-28,168.) Further, officers located firearms quickly, within 10-15 minutes of the search beginning, (Butt Tr. at 95-96), and Butt

testified that he heard them jeering that they "hit the motherload" and saw agents giving each other high fives, and at that point, he knew that he was going to be arrested. (Butt Tr. at 95-96.) Additionally, multiple agents, including Solek, Prout, Mazucca, Schill, and McKeon, testified that, at that point, they felt that the Defendant was no longer free to leave or that his fate was sealed. (Solek Tr. at 154; Prout Tr. at 93; Mazucca Tr. at 31-32; McKeon Tr. at 51-52; Schill Tr. at 7.)

Accordingly, the Court concludes that with such a great deal of chaos, the presence of uniformed officers drawing from four agencies, the intentional separation and supervision of Butt and his wife, the celebratory environment that accompanied the firearms being located within minutes, and the soliciting of Butt's pedigree information, a reasonable person would not have felt "free to leave" at the time that Butt was interrogated.

The Court turns to the second inquiry, which, as the Government correctly notes, asks whether a reasonable person would have thought that their freedom of movement had been restricted to the degree associated with a formal arrest. *Newton*, 369 F.3d at 372. Although a close call, the Court finds that, under the present law and instant facts, the answer is yes.

To start, the Court addresses *Miranda* doctrinally. The Government correctly notes that *Miranda* arose as an appellate review of four consolidated cases, all of which involved defendants who had been formally arrested and questioned by police officers in rooms where they were cut off from the outside world. (Gov. Opp. at 19.); *Miranda*, 384 U.S. at 445. Certainly, due to the obvious risks associated with incommunicado communications, the Supreme Court was concerned with eradicating extreme injustices, such as the use of physical force and sheer brutality to extort false confessions. *Miranda*, 384 U.S. 445-47. The Court's core concern, however, was not to protect human rights. It was to maintain the integrity of the investigatory process, and the sanctity of the rule of law.

> To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' … to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth.

*Id*. at 460. *Miranda's* driving concern was to ensure that criminal confessions be intentional and truthful, and not induced by coercive techniques that are often employed in "isolation and unfamiliar surroundings." *Id*. at 448-50. Although the Court focused on objective signs that a defendant could be coerced, the Court was concerned with psychological manipulation of *any* type. ("Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, … this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition.") (quoting *Blackburn v. State of Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 279 (1960)).

In that vein, the Government's simplistic focus, throughout the hearing, on a finite list of factors (such as whether officers' hands were on the defendant, whether officers' weapons were drawn, whether officers were yelling etc.) drawn from aggregated case law oversimplifies and distorts the very purpose of *Miranda* warnings. Although those factors are frequent indicia of coercion and markers of formal arrest, any lawyer, investigator, and layperson knows that coercive interrogation techniques can take infinite form and are not simply derived from using physical force, blatant threats, and brandishing weapons. Frequently, the subtlest techniques can be the most psychologically disarming.

This is not to take away from *Miranda's* talismanic holding that custody needs to be assessed based on *objective* factors that would make a reasonable person deduce that their freedom of movement had been curtailed to the degree associated with a formal arrest—as opposed to

officers' *subjective* intent to arrest. But again, the Government's overemphasis on a limited list of factors that it claims comprise the limited conditions for "custody" under *Miranda* reflects its efforts to build a house of cards on dubious premises that are divorced from *Miranda's* doctrinal origins. The case law is simply a means to help courts with the ultimately inquiry, which is whether a reasonable person would have felt as *vulnerable* being questioned in one setting as they would have felt at the moment of a formal arrest – and thus as likely to incriminate themselves despite having the constitutional right not to do so.

> The entire thrust of police interrogation there, as in all the cases today, was to put the defendant in such an emotional state as to impair his capacity for rational judgment. The abdication of the constitutional privilege—the choice on his part to speak to the police—was not made knowingly or competently because of the failure to apprise him of his rights; the compelling atmosphere of the in-custody interrogation, and not an independent decision on his part, caused the defendant to speak.

*Miranda*, 384 U.S. at 465.

Bearing these principles in mind, the Court next turns to the Government's emphasis on the location of the search as dispositive factor as to whether a defendant would feel that their freedom of movement had been curtailed to the same degree associated with a formal arrest.

The Government makes too much of the fact that, absent a formal arrest, courts in the Second Circuit have rarely held that a suspect was in "in custody" when questioned in their home. (Gov. Opp. at 24-33.) The Court agrees that few cases have found a custodial interrogation to have taken place within the home and that *Miranda* only requires warnings to be given during in-custody interrogations. But the Court notes, and the Government concedes, that neither the Second Circuit nor the Supreme Court have ever held that the home is incapable of being the setting for an in-custody interrogation. Rather, their decisions have helped color the reasons why, in most circumstances, a reasonable person would not believe that their freedom of movement had been

curtailed to the degree associated with a formal arrest whilst still in their home. *See Miranda,* 384 U.S. at 449-50 ("[i]n [a defendant's] home he may be confident, indignant, or recalcitrant. He is more keenly aware of his rights and more reluctant to tell of his indiscretions of criminal behavior within the walls of his home. Moreover, his family and other friends are nearby, their presence lending moral support.") In other words, the Supreme Court was not carving out the home as place for custodial interrogation *per se* but was just explaining that most people usually feel more empowered in the home compared to when they are in an unfamiliar and isolated settings.

When freedom of movement is curtailed to the degree associated with a formal arrest at home, and an interrogation takes place, *Miranda* warnings are mandatory.

> [T]here can be no doubt that the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons *in all settings in which their freedom of action is curtailed in any significant way* from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

*Miranda*, 384 U.S. at 467 (emphasis added).

Here, the Court finds the existence of that rare situation where a suspect's freedom of movement within his home was curtailed to the degree associated with a formal arrest. First, the Court notes the number of officers that conducted the search, the way the search was executed, and the optics of the search—including the four law enforcement agencies from which the 16 officers drew—would be enough to overwhelm a suspect and make the suspect feel a loss of the usual autonomy one has on their home. In *Faux*, 828 F.3d 130, where a similar search took place within the home, the Second Circuit noted that the location of the home had special significance because generally, "the home is 'the most constitutionally protected place on earth'; thus, the right

to terminate the interrogation and be 'free to leave' is 'hollow' if the one place the individual cannot retreat to, or exclude law enforcement from, is her home. *See also United States v. Craighead*, 539 F.3d 1073, 1077 (9th Cir. 2008) ("The home occupies a special place in the pantheon of constitutional rights."). In *Faux*, the fact that there were 10-15 officers who derived from three agencies, gave the Second Circuit "considerable pause" and raised the very real question of "where in her home [Defendant] could go if she was indeed 'free to go leave.'" *Id*. at 137.

Here, the fact that the search was conducted in Defendant's home, where the Defendant was clearly outnumbered by the number of officers and separated from his wife is not a factor that weighs in the Government's favor as the Government contends.

Because Butt was deprived of the very sovereignty over his home that would otherwise empower him. Sixteen officers spread throughout his home and restricted his movement to the living room couch, with one officer monitoring him and supervising him constantly. His wife was relegated to a different room and kept under the supervision of another officer, thereby depriving Butt of access to his only potential confidante. Butt also had no access to his phone or a computer. There was credible testimony from Sayegh that the officers were not allowing Butt to speak with him on the phone or to speak with his wife during the search. And as discussed earlier, the officers disabled Butt's surveillance camera system. Even though this did not constitute a due process violation, it is an objective factor that would contribute to a reasonable person feeling a significant restriction on their freedom of movement. Butt had no access to communication channels, could not speak to any of his confidantes, and had no safe space within his home where he could retreat. Accordingly, The Court finds that he was made to be as isolated and cut off from the outside world within his home as he would have been had he been in some isolated police cite. *See Craighead*,

539 F.3d at 1077 ("the Supreme Court was explicit that the law enforcement technique of isolating the suspect from family and friends is one of the distinguishing features of a custodial interrogation.)

In addition, *Miranda* was driven by the risk of psychological coercion derived from a non-public setting. *Id*. at 445. ("In each [of the four cases on review], the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world."). In most of cases the Government cites, which held that there was no custody, the interrogation occurred in public settings, where the real danger—the shield of secrecy—was absent. The Supreme Court in *Berkemer*, a case in which the Court was assessing *Miranda* custody during a roadside traffic stop, explained:

> Perhaps, most importantly, the typical traffic stop is public, at least to some degree. Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorists fear that, if he does not cooperate, he will be subjected to abuse.

468 U.S. at 438. Hence, courts repeatedly find that the publicness of the setting is important. *see also, New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984) (dealing with public safety exception to providing *Miranda* warnings because the questioning occurred in a grocery store—a distinctly public setting); *United States v. Schaffer*, 851 F.3d 166 (2d Cir.), *cert. denied*, 138 S. Ct. 469 (2017) (dealing with voluntary interrogation of defendant in his office building where defendant could drink coffee and smoke cigarettes); *United States v. Ross*, 719 F.2d 615 (2d Cir. 1983) (dealing with interrogation in public restaurant after being given explicit warnings about not being under arrest).

Here, Butt was not only deprived of his normal sovereignty from his home, but he was also deprived of the protection of public scrutiny. Again, because Butt had access to no confidante and

no technology, and because his surveillance system was disabled, he was closer to being in the type of custody that one is in when they are formally arrested and physically cut off from the outside world than the type of custody that sometimes accompanies questioning at roadside stops, airports, offices, and restaurants, where the margin for indiscretion is more slim.

The Court still recognizes that the situation here resembles the situation in *Faux*, where the Second Circuit ultimately found that there was not a custodial interrogation in the home despite the district court's findings. But as Defendant notes, even apart from the differences in the number of officers and surveillance camera disablement, which make this situation more extreme than that in *Faux*, there is a monumental distinction between the instant situation and that in *Faux*. Indeed, this distinction separates the current situation from every single Second Circuit case that the Government cited in its favor. In every single Second Circuit case cited by the Government in which the defendant was found *not* to be in custody during interrogation, the agents had *explicitly* told the defendant than he/she was not under arrest and was free to leave:

> Thus, in *United States v. Cota*, 953 F.2d 753, the defendant was explicitly told she was free to leave after cuffs were removed during traffic stop; in *United States v. Ross*, 719 F.2d 615, the defendant was explicitly told he was not under arrest and was free to leave; in *United States v. Kirsch*, 54 F.3d 1062, the defendant was explicitly told that she could leave or stay, as she wished; in *United States v. Badmus*, 325 F.3d 133, the defendant was told that neither he nor his wife were under arrest, and the agents told his wife that they were "guests" in their house and would leave if she asked them to; in *United States v. Familetti*, 878 F.3d 53, the defendant was twice advised that he was not under arrest and was free to leave ("Such advice, while not dispositive, is probative in 'assessing the extent to which a reasonable person would understand any restraints on his freedom.'" 878 F.3d at 60, citing *Newton*, 369 F.3d at 676); in *United States v. Schaeffer*, 851 F.3d 166, the defendant was explicitly advised that he was not under arrest.

(*See* Defendant's Reply Memorandum, ("Def. Rep."), at n.1, ECF No. 47.)

Here, the Government concedes that no one ever told Butt than he was not under arrest, and that he was free to move around, leave, or not speak with the agents. (Gov. Opp. at 35.) But

the Government argues that the short duration of the questioning should make up for this deficiency. (*Id.*) The Court disagrees. While the length of questioning can be a factor that helps reveal the likelihood of a custodial setting and use of coercive investigative techniques, the length of the questioning is not what drove the need for warnings in *Miranda*. The impetus for requiring *Miranda* warnings was driven by the need for suspects, whose psychological integrity is likely to be compromised, to know their rights before an interrogator has the chance to "overbear the[ir] will" and seduce incriminating statements. 384 U.S. at 469.

> [T]he Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves. We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored….[I]f a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent. For those unaware of the privilege, the warning is needed simply to make them aware of it—the threshold requirement for an intelligent decision as to its exercise. More important, such a warning is an absolute prerequisite in overcoming the inherent pressures of the interrogation atmosphere. It is not just the subnormal or woefully ignorant who succumb to an interrogator's imprecations, whether implied or expressly stated, that the interrogation will continue until a confession is obtained or that silence in the face of accusation is itself damning and will bode ill when presented to a jury. Further, the warning will show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it.

*Id.* at 467.

As the Court already explained, although Butt was in his home, the conditions in his home made it a police-controlled setting akin to a station that is cut off from the outside world. As in *Faux*, Butt was outnumbered by officers from a range of agencies who separated him from his spouse, dispersed throughout his home, and did not permit him to freely move about during the

search. But unlike in *Faux*, where the defendant was given express warnings about 20 minutes into the interview that "she was 'not under arrest,'" and where the defendant and her spouse then voluntarily decided to cancel their plans and remain in the home during the search, Butt was never told that he was not under arrest or given any information about his rights. Butt and his wife never made a voluntary decision to stay in the home during the search and participate and cooperate. They were intentionally isolated, separated from each other, and constantly monitored. Butt had no contact with the criminal justice system for two decades, and there was no evidence that he otherwise knew about his right to remain silent or have an attorney. (Butt Tr. at 96.) The evidence showed that Butt was deprived of a chance to speak with an attorney or otherwise learn of his rights. It also showed that multiple officers heard Mazucca questioning Butt about the exact information that would be the key evidence for the crime with which he was charged—being a felon in *possession* of firearms. Mazucca's own testimony reflects that he asked Butt the most incriminating questions directly and repeatedly.

> So, I went upstairs and asked Mr. Butt—told Mr. Butt, you know, we found long guns and bullets that didn't match the long guns, so, you know, where is the handguns? And Mr. Butt didn't advise that there were handguns there. And I inquired, I said, what do you use these big guns for, hunting? And Mr. Butt says, oh no, no, we use them for target practice. And I said, you shoot these long guns here near the house? He says, no, in the back. The property is very long. It's big. I said, with the houses around there? And he says, yeah, we go back. You know, we – it was a large property. *And then I inquired again, you know, Mr. Butt, where is the handguns? We have bullets that don't match the long gun.*

(Mazucca Tr. at 12-13.) The fact that Butt succumbed and gave Mazucca an incriminating response because he was getting annoyed, (Butt Tr. at 109-110), does not absolve Mazucca's behavior. Rather, it shows that Mazucca was persistent in his questioning of the Defendant, who was already at the mercy of police dominion in his home, into saying something incriminating. Further, whilst not dispositive, at least three different officers, including Mazucca, testified that they knew that

there was already probable cause to arrest Butt at the time that Mazucca asked incriminating questions.

The circumstances when a custodial investigation takes place in a home may be rare, but they occasionally emerge. *See Orozco v. Texas*, 394 U.S. 324, 89 S. Ct. 1095, (1969) (finding that the defendant was entitled to *Miranda* warnings when agents entered his bedroom and questioned him at 4:00 am without providing warnings); *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) (holding that *Miranda* warnings were required when a suspect was questioned in his home without warnings and where the presence of agents from three law enforcement agencies, combined with other factors, would make a reasonable person believe that their freedom of movement had been significantly restricted). When a person is questioned about incriminating conduct in the sanctity of their home after a significant amount of their freedom of movement has been curtailed, and is not told that they are not under arrest and have the freedom to move about or consult an attorney, or to not answer the questions that are being asked by persistent law enforcement officers, a reasonable person would believe that their freedom of movement has been restricted to the same degree associated with a formal arrest.

In Butt's home, *Miranda's* custodial setting existed. The Government's agents repeatedly contradicted one another and failed to redeem their credibility. There was no reason that Butt should not have been told that he was not under arrest and what his rights were. (*See* Solek Tr. at 155.) Though *Miranda* may apply in narrow situations, it developed for a very specific reason. That reason cannot be abrogated when law enforcement agents do a sloppy job. (*See id*. at 163-64) (Discussing her inaccurate depictions of the *Miranda* warnings, and Butt's statements in the criminal complaint.)

Accordingly, Defendant's motion to suppress the statements made in response to

Mazucca's questioning immediately after the firearms were discovered is hereby GRANTED.[3]

## CONCLUSION

For the reasons discussed, Defendant's Motion is GRANTED in part and DENIED in part. It is granted insofar as suppressing Defendant's statements pursuant to *Miranda v. Arizona*. It is denied as far as: (1) suppressing any evidence seized during the execution of the search warrant pursuant to the Fourth Amendment of the Constitution and (2) waiving the indictment, pursuant to the Fifth and Fourteenth Amendments of the Constitution. The parties are directed to appear for a status conference on February 27, 2019 at 11:00 am.

Dated:   February 6, 2019                      SO ORDERED:
         White Plains, New York

NELSON S. ROMÁN
United States District Judge

---

[3] The Court briefly notes that the testimony presented at the hearing also reflected that Butt made certain statements about a bulletproof vest that agents discovered during the search. The undisputed testimony reflected that Butt, of his own accord, asked the officers "why he could not have a vest" (*See* McKeon Tr. at 47-48.) The Court finds the statements that Butt made about the bulletproof vest are spontaneous statements that cannot be suppressed. *See Brewer v. Cunningham*, No. 13 CIV. 2873 (NSR), 2018 WL 6697991, at *2 (S.D.N.Y. Dec. 20, 2018) (holding that statements that a defendant made spontaneously, and which were not "prompted by police inquiry" or "designed to elicit a remark nor a response," did not constitute a custodial interrogation and therefore would not be suppressed.)