

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

July 17, 2019

**BY ECF**

The Honorable Nelson S. Román
United States District Judge
300 Quarropas Street
Southern District of New York
White Plains, NY 10601-4150

    **Re:** *United States v. Atiq Butt*, **18 Cr. 87 (NSR)**

Dear Judge Román:

    The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for July 24, 2019. For the reasons explained below, the Government requests that the Court impose a sentence within the 30 to 37-month Guidelines range.

    All but denying responsibility for his crimes, the defendant claims in his sentencing submission that all of the firearms underlying his convictions belong to others, and would have the Court believe that he finds himself facing sentencing simply because her permitted his domestic partner and brother-in-law to store guns at his home. (PSR ¶ 21) (explaining his offense by informing the Probation Officer that "his wife possessed two rifles, and '[m]y brother-in-law brought some guns to my home because he lived with his mother, and his mother didn't want guns in her home.'" (*See also* Def.'s Mem. at 2). The defendant portrays himself as someone who poses no danger to the community, and claims that he "has done more to contribute to the common welfare than the vast majority of citizens," and that his "history demonstrates . . . his dedication to serve others who have less than himself." (Def.'s Mem. at 4). He goes nearly so far as to suggest that he is the victim in this case. Consistent with his initial refusals to admit during the suppression and *Fatico* hearings that he committed the fraud underlying his prior felony conviction, he blames his status as a convicted felon who was prohibited from possessing firearms on the "ineptitude of his attorney," who filed an unsuccessful expungement application on his behalf. (Def.'s Mem. at 4). And the defendant boldly states that "after his conviction, [he] lived a law-abiding life for 21 years, until he was convicted by his plea of guilty in the instant case." (Def.'s Mem. at 2).

    Neither the man nor the conduct described in the defendant's sentencing memorandum reflect reality. The Government respectfully submits that the Court should sentence the defendant based not upon the false image set forth in his sentencing papers, but based upon his actual history, characteristics, and conduct, which together demonstrate that a Guidelines sentence is necessary to serve the legitimate purposes of sentencing in this case.

**A. Background**

This case arises from defendant Atiq Butt's possession of six firearms, including two AR-15 style and one AK-47-style semi-automatic rifles, a high capacity AR-15 magazine, approximately 25,000 rounds of ammunition, and a ballistic vest, following his prior felony conviction. He stands convicted of six counts of felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).

The defendant was born outside the United States in 1959, immigrated to the United States in 1986, and is a naturalized United States citizen. (PSR ¶¶ 44 and 49). Other than these bare facts, essentially all of the defendant's personal history set forth in the PSR comes from the defendant himself. (*See* PSR ¶¶ 44-51). The defendant claims, among other things, to have suffered three bullet wounds, on two separate occasions, while serving in the Israeli military, and describes a childhood involving flight from the Taliban. (PSR ¶¶ 56 and 57). Notably, no person with any basis of knowledge has corroborated these or other assertions by the defendant of his history prior to approximately nine years ago, when he met his domestic partner, Willowmenia Costa. (*See* PSR ¶¶ 44-53).

The defendant concedes that he has no relationship with two of his five children, does not know where two others live, and has not corresponded with the fifth, who purportedly resides in New Jersey, since at least December 2017. (PSR ¶ 50). Although the defendant appears to have resided in the United States for more than 30 years, and professes to have been active in politics and extremely generous in his community, at the time of this filing, the only letters in support of the defendant submitted on his behalf are from Costa, two physicians, and a counseling therapist. (*See* Letters in Support, Dkt. Nos. 62-65). Although Costa purports to recount the "love and kindness" he has showed to the community "for 17 years," she simultaneously notes that she met him in 2009. (*See* Costa Letter, Dkt. No. 62). As a result, the defendant's self-serving assertions set forth in the PSR are largely unverifiable, and other than his documented criminal history, his past it largely unknown.

What is clear is that, on July 24, 1998, the defendant was sentenced to seven years' imprisonment following his conviction of theft by deception, a felony offense, in Mercer County, New Jersey Superior Court. (PSR ¶ 16). The conviction resulted from the defendant's scheme to defraud Medicaid of approximately $313,000 through the submission of false laboratory claims from a testing company of which he was the president and sole owner. (*Id.* ¶ 37). The defendant's medical license was revoked as a result of this conviction. (*Id.* ¶ 66). A contemporaneous news article details the defendant's scheme. *See* Drewniak, Michael, *Medicaid Fraud Schemes Entrap Both Drug Users and Shady Doctors*, Seattle Times (November 15, 1998), attached hereto as Exhibit 1, and also available at http://community.seattletimes.nwsource.com/archive/?date=19981115&slug=2783619. The article, published shortly after the defendant's sentencing, recounts that the defendant paid a woman $200 per batch of blood, which she had purchased from drug addicts for $50 per batch. *See id.* The defendant then performed needless tests on the blood through his laboratory, billing Medicaid into the thousands of dollars for each batch of blood. *See id.*

As a result of this conviction, on October 18, 2001, the defendant was excluded from participation in federal health care programs. *See* U.S. Department of Health & Human Services, Office of Inspector General ("HHS-OIG") Exclusion Information, attached hereto as Exhibit 2.

The defendant was paroled in New Jersey in December 2000. His parole expired in March 2002.

In March 2004 the defendant was charged with simple assault, terroristic threats, and harassment, in Elizabeth, New Jersey. (PSR ¶ 41). These charges were ultimately dismissed. (*Id.*).

In July 2005 the defendant was charged with simple assault and harassment, in Elizabeth, New Jersey. (PSR ¶ 42). Again, the charges were ultimately dismissed. (*Id.*).

In August 2006 the defendant was charged with terroristic threats and harassment, in Elizabeth New Jersey. (PSR ¶ 47). Again, the charges were ultimately dismissed. (*Id.*).

On or about August 5, 2013, through counsel, the defendant filed a petition for expungement of his New Jersey conviction. (*See* Def's Mem, Ex. C at 3-8). That petition was denied on April 25, 2015, for "failure to comply with statutory prerequisites." (*Id.* at 1-2).

On October 13, 2017, Costa's minor daughter filed a petition in Putnam County Family Court, alleging that she had been abused by the defendant and seeking an order of protection. After issuing temporary orders of protection, the Family Court ultimately issued an order of protection on consent. (*See* Def.'s Mot. *In Limine*, Dkt. No. 52, at Exhibit 1).

The defendant reported to the Probation Department that, from 2000 through his December 2017 arrest, he owned and operated Zion Management Group, in Port Washington, New York, and that he acted as a "medical consultant," "assist[ing] doctors with, among other things, health guidelines." (PSR ¶ 67). He further reported that he "was compensating himself $300,000 annually at the time of his arrest." (*Id.*). Also until the defendant's arrest, "he assisted his wife with her company, Bio Science Laboratories, Inc. ("Bio Science"), which was also located in Port Washington." (*Id.*). Like the defendant's prior laboratory through which he conducted the fraud underlying his 1998 conviction, Bio Science was largely in the business of testing blood specimens, and furnished items and services payable by federal health care programs. The defendant claims that he was not compensated for his work at Bio Science (*id.*), but payroll records reflect that the defendant received income from Bio Sciences during at least two quarters. The defendant reported that he was Bio Sciences' "program developer," and was apparently so essential to its operations that the laboratory, which had operated since at least 2013, closed after his arrest. (*See id.*). This is noteworthy because, among other things, as a result of his prior health care fraud conviction and resulting 2001 exclusion from federal health care programs, the defendant was:

> prohibited from furnishing administrative and management services that are payable by the Federal health care programs. This prohibition applies even if the administrative and management services are not separately billable. For example,

>an excluded individual may not serve in an executive or leadership role (*e.g.*, chief executive officer, chief financial officer, general counsel, director of health information management, director of human resources, physician practice office manager, *etc*.) at a provider that furnishes items or services payable by Federal health care programs.  Also, an excluded individual may not provide other types of administrative and management services, such as health information technology services and support, strategic planning, billing and accounting, staff training, and human resources, unless wholly unrelated to Federal health care programs.

(May 8, 2013 Updated Special Advisory Bulletin on the Effect of Exclusion from Participation in Federal Health Care Programs, Issued by the U.S. Department of Health and Human Services, Office of Inspector General).

As the Court heard at the suppression hearing, the defendant's possession of a veritable arsenal of weapons, as a convicted felon, only came to the attention of law enforcement on December 11, 2017, during the course of health care fraud and public corruption investigations being conducted by HHS-OIG and the Federal Bureau of Investigation.  (*See* November 6, 2018 Suppression Hearing Tr. at 34, 42, 106, and 108).

As the Court heard and observed during the *Fatico* hearing, the six firearms and most of the approximately 25,000 rounds of ammunition possessed by the defendant were kept in his basement, in and adjacent to an unfinished room with a makeshift bed and a video screen that was configured to monitor sixteen surveillance cameras set up in and around the defendant's home.

Two of the firearms underlying the defendant's convictions were purchased by Costa.  As the defendant notes, two others were purchased by Costa's brother, Nathaniel McElhinney, who was convicted in 18-CR-753 (CS/JCM) of causing a licensed firearms dealer to make false statements that MacElhinney was the true buyer of firearms he purchased.  While claiming that he merely permitted Costa and MacElhinney to store the firearms at his home, the defendant omits from his memorandum the fact that the defendant purchased the remaining two firearms – the Colt Match Target HBAR AR-15 semi-automatic rifle and the Romarm AK-47 semi-automatic rifle – from a third person, for cash, in the parking lot outside the defendant's office, approximately two months before the defendant's arrest.  *See* ATF Report of February 22, 2019 Proffer, attached hereto as Exhibit 3.[1]  *See also* Prior Interview Reports, attached hereto as Exhibit 4.  This third party was hired by the defendant to do IT work at Bio Science.  *See id.*  It is notable that this person knew the defendant not as Atiq Butt, but as Atiq Kahan, *see id.*, despite the fact that defendant's name is Atiq Butt, and the defendant explained to the Probation Office "that he was born Atiq Kahan in India but was forced to change his name when he was 15 years old."  (PSR ¶ 44).

Another former consultant of Bio Science hired by the defendant reported that he too initially knew the defendant not as Atiq Butt, but as Atiq Kahan.  *See* FBI-302 re: June 19, 2018 Interview at 2, attached hereto as Exhibit 5.  This witness also reported that the defendant brought firearms to his office, including an assault rifle and handguns.  *Id.* at 3.

---

[1] The Government will submit substantially less redacted copies of referenced FBI 302s and ATF Reports of Investigation under separate cover.

### B. The Plea and Guidelines Calculation

#### 1. Offense Level

As set forth in the Court's June 28, 2019 Order following the *Fatico* hearing, the Base offense level is 20, pursuant to U.S.S.G. § 2K2.1(a)(4)(B).  (*See also* PSR ¶ 25).

Because the offense involved six firearms, two levels are added, pursuant to U.S.S.G. § 2K2.1(b)(1)(A).

The Government does not object to the Probation Department's conclusion that the defendant is entitled to a three-level reduction for timely acceptance of responsibility, pursuant to U.S.S.G. §§ 3E1.1(a) and (b).

Accordingly, the Government agrees with the Probation Office's determination that the total offense level is 19.

#### 2. Criminal History Category

The Government agrees with the Probation Office's calculation that the defendant's criminal history category is I.  (*See* PSR ¶ 38).

#### 3. Guidelines Range

The Government agrees with the Probation Office's calculation of the 30 to 37-month Guidelines range.  (*See* PSR ¶ 74).

### C. A Within-Guidelines Sentence is Necessary to Achieve the Purposes of Sentencing in this Case

The Court is well aware that the Sentencing Guidelines provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law.  *Id.* at 50 & n.6.  In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;

      (C) to protect the public from further crimes of the defendant; and

      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    The Government respectfully submits that the within-Guidelines sentence recommended by the Probation Department is sufficient, but not greater than necessary, to comply with the purposes of sentencing in this case.

    The defendant argues that the circumstances of his offense are well outside the typical "heartland" of felon in possession cases. He is correct in more ways than he recognizes in his memorandum. The typical felon in possession case does not involve multiple AK-47 and AR-15 style semi-automatic firearms, 25,000 rounds of ammunition, and a bulletproof vest. The typical felon in possession, perhaps stopped on the street or found to have a gun in a closet at home, does not possess this sort of arsenal of firearms, and keep them mostly loaded in a basement that may be fairly said to resemble a bunker, equipped with a makeshift bed and extensive video surveillance monitoring equipment.

    Contrary to the defendant's claim, his conduct and history are not "very similar" to those of the defendant in *United States v. English*, 333 F.Supp.3d 1311 (M.D. Alabama 2018). First, unlike the defendant, English did not possess six firearms, 25,000 rounds of ammunition, and a bulletproof vest. Second, the court found that English possessed his firearms only so that he could teach his sons to hunt. The closest analog in this case to the sons English intended to teach to hunt, is Costa's minor daughter, who, rather than intending to go hunting with the defendant, obtained an order of protection against him two months prior to his arrest – the same month he purchased another AR-15 and an AK-47 in a parking lot from a third straw purchaser. Third, it does not appear that, at the very time English purchased and possessed his weapons, law enforcement was conducting an investigation of his business for activity strikingly similar to that underlying English's prior fraud conviction.

    Perhaps most critically, English did not deny at sentencing that he owned the firearms in his case. This defendant, however, continues to claim that he merely had dominion and control over firearms in his basement. He maintains that MacElhinney and Costa – who were two of three straw purchasers he utilized – were the *owners* of those firearms, simply because receipts reflect that they purchased them. (*See* Def.'s Mem. at 2 and note 2). He would have the court believe that he finds himself before the Court merely because he made the mistake of permitting family members to store firearms in his basement. This claim, however, is directly refuted by witnesses with whom he worked, as set forth above.

    In sum, in light of the serious nature of the crimes for which the defendant stands convicted, his history, background, and characteristics, and his continuing efforts to blame others for his illegal conduct, a Guidelines sentence is necessary to serve the ends of sentencing—including

promoting respect for the law, providing just punishment for this particular defendant, and serving the needs of both specific and general deterrence. [2]

**D. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court sentence the defendant to a term of imprisonment within the 30 to 37-month Guidelines range.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: ___/s/ Jeffrey C. Coffman_____
Jeffrey C. Coffman
Assistant United States Attorney
(914) 993-1940

cc: Camille M. Abate, Esq.
(via ECF)

---

[2] The defendant quotes part of one sentence from Tonry, Michael, *Purposes and Functions of Sentencing*, 34 Crime & justice: A Review of the Research 28-29 (2006), and pronounces that "all reliable empirical research that 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." (Def.'s Mem. at 7). Yet this quotation leaves out critical context. Tonry argues not that longer sentences do not provide additional deterrence, but that factors outside of the Court's control, , including criminals' understanding that they will be offered plea bargains, undermine some of the deterrent value in longer sentences. *See* Tonry, *supra*, at 29. And, contrary to the defendant's claim, there are in fact studies that conclude that an increased length of imprisonment has a deterrent effect. *See* Nagin, Daniel S., *Deterrence: A Review of the Evidence by a Criminologist for Economists*, 2013 Annual Rev. Econ. 5:83, 86-88, 97-98 (2013)).